A94A0752. IN THE INTEREST OF M. R., a child.
(444 SE2d 866)

McMURRAY, Presiding Judge.

Gwinnett County's Department of Family & Children Services ("DFACS"), acting on behalf of Georgia's Department of Human Resources, filed a petition in the Juvenile Court of Gwinnett County to terminate parental rights of the biological parents as to the minor child, M. R. The child's father did not appear at a hearing on the petition to terminate parental rights, but the child's mother appeared with the maternal grandmother and her court-appointed attorney. The child was represented by a court-appointed guardian ad litem.

On October 22, 1993, the juvenile court judge entered an order with the following findings of fact: "The date of the birth of the child is May 27, 1990. . . . The child, now age 3 years and 4 months, has been in the temporary custody of [DFACS] since September 30, 1991, when [the child] was approximately 16 months old. . . . The child's biological parents . . . were married to each other by common law, according to the mother. However, they have not obtained a divorce and have not lived together for over two years. The child's father . . . has lived with the child only briefly (according to the mother), but has not contributed to the child's support nor provided support for the mother (including medical care) either during her pregnancy or during her hospitalization for the birth of the child. The mother testified that [the child's father] had no parental bond with the child and had never supported the child. [DFACS] has had no contact from [the child's father]. He has not visited the child nor provided financial support for the child while in [DFACS] custody, nor has he participated in case plans to determine the child's future.

"The child was removed from the home, where he was living with his mother, maternal grandmother and maternal uncle, on September 30, 1991. The court found that this home was an extremely unsanitary living environment, in that the apartment was filled with trash, spoiled insect-infested food and cat feces. Moreover, the apartment was waterlogged due to an overflowing toilet. The child suffered at that time from conjunctivitis. In addition, the child had a closed tear duct for which surgical treatment was necessary.

"The mother and grandmother plead guilty to and were convicted of reckless conduct with regard to this incident. By this conviction they consciously disregarded a substantial and unjustifiable risk of endangering the child's safety, which was a gross deviation from the standard of care which a reasonable person would exercise in the situation. OCGA § 16-5-20 (b). As part of the sentence, the mother was ordered to complete a mental health evaluation and a parenting skills class, which she completed.

"The case plans and court orders for reunification of the child with the mother have required the mother to maintain stable, clean housing, stable employment, complete counseling and parenting skills classes and pay child support. Although she has completed parenting classes, which were attendance based, and partially completed counseling, she has not completed the remaining requirements. This court found in its extension order dated May 20, 1993, that the mother had not complied with all of the elements of the case plan. In September 1992, the mother knew that the case plan goal had been changed to termination of parental rights.

"The mother was evicted from the apartment where she was living at the time of the child's removal due to the filthy living condi-

tions. Parenthetically, around the time of the child's removal, she surrendered her rights to another child upon that child's birth. After her eviction she stayed temporarily with different friends for approximately six weeks, until she moved into successive, temporary motel efficiencies with her mother and brother. In February 1993, she moved away from her mother and lived in a three-bedroom apartment with five other adults for approximately six weeks. Following unsuccessful living arrangements with a friend in Smyrna and Atlanta, she moved back to her mother's two-bedroom apartment in Lawrenceville, where she has resided with her mother and brother since June 1993. In total, she has lived at seven or more residences in the two-year period that the child has been in [DFACS'] temporary custody. With the possible exception of her last place of residence, all of her places of residency have been temporary.

"Petitioner conducted an announced visitation between the mother and the child at the mother's current residence in July 1993, and found the home to be cluttered, though not a health risk. Several weeks later petitioner conducted an unannounced visitation at the home and found the home to be more cluttered, illustrating poor housekeeping skills.

"During the two year period since the child's removal from the home, the mother has had at least 12 different places of employment, most of which have been for approximately 20 hours per week at minimum wage or less in the fast-food industry. She is presently employed as a cook at Pizza Hut, where she reports working 40 hours, earning $140 net weekly.

"The court ordered the mother to pay $20.00 per week as child support beginning October 3, 1991. None has been paid. She has refused to pay support, because the State had removed the child from her custody. Additionally, she testified that she wanted to pay her debts first; however, she could not account for their dollar value. She pays very little rent where she presently lives.

"Although the mother has visited the child, [DFACS] has provided transportation to her to enable her to visit on several occasions due to her lack of transportation. She and the child have shown very little familial bonding with each other. After the goal of the case plan changed to termination of parental rights, the mother became emotionally detached from the child. Moreover, she demonstrated a lack of parenting ability with the child at these visits. At the child's last visit with the mother, October 12, 1993, the mother dressed the child in clothing she had brought, but took the clothing with her upon completion of the visit.

"The child has been in the same foster home since his removal from the mother's home. The child has bonded to his foster family, who would offer the child an adoptive home.

"[DFACS] has attempted to locate a suitable family member for placement but has been unsuccessful. There are no suitable relatives willing and able to take responsibility for the child."

The juvenile court terminated parental rights of the biological parents as to M. R., concluding that the child is deprived due to lack of proper parental care or control; that the deprivation is likely to continue or will not be remedied; that continued deprivation is likely to cause serious physical, mental, emotional or moral harm to the child and that termination of the biological mother's parental rights is in the best interest of the child. The mother then filed this appeal. *Held*:

1. The mother challenges the sufficiency of the evidence, arguing the juvenile court's finding that she failed to pay court-ordered child support for a period of 12 months or longer, that she failed to provide a stable home environment while the child was in protective custody and that she failed to maintain stable employment during this period was insufficient to support termination of her parental rights.

"The termination of parental rights under OCGA § 15-11-81 is a two-step process. First, the court determines whether there *is* clear and convincing evidence of parental misconduct or inability. Second, the court considers whether termination is in the best interest of the child. *In the Interest of G. K. J.*, 187 Ga. App. 443, 444 (3) (370 SE2d 490) (1988). The standard for appellate review of a termination of parental rights is ' "whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights had been lost. (Cit.)" (Cit.)' *In the Interest of R. L. H.*, 188 Ga. App. 596, 597 (373 SE2d 666) (1988)." *In the Interest of C. D. P.*, 211 Ga. App. 42, 43 (3), (438 SE2d 155).

(a) *Parental Misconduct or Inability.* " 'Parental misconduct [or inability] is determined by finding: 1) the child is deprived; 2) lack of proper parental care or control is the cause of the deprivation; 3) such deprivation is likely to continue or will not be remedied; 4) continued deprivation is likely to cause serious physical, mental, emotional or moral harm to the child. (Cit.) Among the factors which may be considered with regard to a child lacking proper parental care or control [is] physical, mental or emotional neglect of the child. (Cit.) Another consideration is whether the parent without justifiable cause failed significantly for a period of one year or longer to comply with a court ordered plan designated to reunite the child with the parent. (Cit.)' *In the Interest of B. J. H.*, 194 Ga. App. 282 (1) (390 SE2d 427) (1990)." *In the Interest of M. M.*, 207 Ga. App. 722, 724 (1) (429 SE2d 132). This includes unexplained or unjustified failure to pay child support under the family reunification plan for a period of 12 months or longer. OCGA § 15-11-81 (b) (2). Compare *Thorne v. Padgett*, 259 Ga. 650 (386 SE2d 155).

In the case sub judice, an apparently unappealed order entered by the juvenile court on October 4, 1991, established that M. R. was then a deprived child pursuant to OCGA § 15-11-81 (b) (4) (A) (i). *In the Interest of B. P.*, 207 Ga. App. 242, 245-246 (427 SE2d 593); *In the Interest of C. D. P.*, 211 Ga. App. 42, 43 (3), 45, supra. Further, there is undisputed evidence that the mother failed to appear at an October 3, 1991, hearing to determine whether the less than 17-month-old child was deprived and that the juvenile court then found M. R. to be deprived due to a lack of medical care and unsafe and unsanitary living conditions. Undisputed evidence also shows that on October 4, 1991, the juvenile court confirmed removal of the child from the mother's custody by DFACS on September 30, 1991, and then directed the biological parents to cooperate with DFACS, "to participate in parenting skills training classes, to obtain and maintain stable employment and living arrangements or [to] follow any other recommendation made by [DFACS and] ordered . . . the mother [to] pay child support in the amount of *$20.00* per week to [DFACS] through the Child Support Recovery Unit." There is also no dispute that the mother did not comply with the plan for family reunification by failing to pay court-ordered child support (despite evidence of the mother's ability to pay) for a period of more than twelve months, failing to maintain a stable or appropriate home environment (the record indicates that the mother resided at no less than six temporary locations since placement of the child in protective custody) and failing to demonstrate the ability to maintain steady employment or sufficient income to support of the child (the record indicates that the mother had at least eight different part-time or low-paying jobs since the child's placement in protective custody). This proof and testimony from a DFACS caseworker that "[t]here were periods of time [the mother] did not call for a visit[,] sometimes a couple of months would go by when she did not have a visit" and that the mother displayed weak parenting skills during such visits constitutes clear and convincing proof that the child is currently deprived due to parental inability, that said deprivation is likely to continue or will not be remedied and that continued deprivation is likely to cause serious physical, mental, emotional or moral harm to the child.

(b) *The Best Interest of the Child.* "In considering the child's best interest, the trial court may consider the child's need for a stable home situation and the detrimental effects of prolonged foster care. *In re G. M. N.*, 183 Ga. App. 458, 461 (1) (359 SE2d 217) (1987)." *In the Interest of J. M. C.*, 201 Ga. App. 173, 174 (410 SE2d 368). Further, "[t]he [Juvenile Code] (Ga. L. 1971, p. 709 et seq.) is to be liberally construed toward the protection of the child whose well-being is threatened. Code Ann. § 24A-101[, now OCGA § 15-11-1]. Deprivation of love and nurture is equally as serious as mental or physical

disability. Goldstein, Freud & Solnit, Beyond the Best Interests of the Child, 32-34. 'A termination hearing seeks above all else the welfare of the child, with due regard for the rights of the natural and adoptive parents. (The judge) will realize that the natural parents must be cautioned, informed, counseled, and protected; he will realize that the adoptive parents must likewise be protected, that their reliances and expectations should be strongly considered. And, after considering the interests of these parties, when the judge is faced with the final decision in an adoption (or termination) case, he will ponder again that ancient question, "Is it well with the child?" ' Katz, Judicial and Statutory Trends in the Law of Adoption, 51 Georgetown Law Journal, 64, 69, 95." *In re Levi*, 131 Ga. App. 348, 351 (3), 352 (206 SE2d 82).

In the case sub judice, a DFACS caseworker testified that she observed little family bonding between the mother and the child during supervised visits. The caseworker's testimony also reveals that DFACS went to great lengths to assist the mother in visiting the child and to set the mother on a road to parental responsibility. Further, there is evidence that the child has remained in a stable foster home since removal from the mother's custody; that the child is well-adjusted and happy in the foster home; that the child has bonded with the foster family and that the foster family aspires to adopt the child. This evidence, along with evidence that the mother has been unable to deliver the child from a state of deprivation since September 30, 1991, authorizes the juvenile court's finding, via clear and convincing evidence, that termination of parental rights is in the best interest of the child. Consequently, since further insecurity regarding the child's parental situation may be damaging to the child, we find that the juvenile court did not abuse its discretion in terminating the biological mother's parental rights as to M. R. See *In the Interest of G. K. J.*, 187 Ga. App. 443 (2) (370 SE2d 490); *In the Interest of B. P.*, 207 Ga. App. 242, 245-246, supra.

2. In her second enumeration, the mother contends "DFACS offered no services as the agency made a determination over a year prior to trial to terminate [her] parental rights."

"The relevant portions of OCGA § 15-11-81 (b) (4) (C) provide: 'In addition to the considerations in subparagraph (B) of this paragraph, where the child is not in the custody of the parent who is the subject of the proceedings, in determining whether the child is without proper parental care and control, the court shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights: . . . (iii) To comply with a court ordered plan designed to reunite the child with the parent or parents.' " *In the Interest of C. D. P.*, 211 Ga. App. 42 (1), supra. This Code subsection and OCGA § 15-11-41 (b) impose a duty

on DFACS to make "reasonable efforts" to reunite the family for at least a year after a plan has been formulated for family reunification.

In the case sub judice, an exhibit in the trial transcript reveals that DFACS formulated a plan for permanent family reunification on September 30, 1991. However, the record reveals that after a year of assistance from DFACS under this plan, the mother failed to comply with terms of the case plan and failed to demonstrate abilities necessary for family reunification. The record also shows that another case plan, dated September 15, 1992, was documented, changing the goal from permanent family reunification to "Termination of Parental Rights."

Appellate counsel for DFACS cites no authority (or argument in opposition to this enumeration) that "Termination of Parental Rights" is an appropriate goal under a case plan designed for family reunification and we find none. However, the record indicates that the notation, "Termination of Parental Rights," was entered just short of eleven months and two weeks after formulation of the original plan for family reunification and that DFACS continued to monitor and assist the mother after entry of the goal, "Termination of Parental Rights." Consequently, it appears that DFACS made "reasonable efforts" to reunite the family for a least a year after formulation of the original case plan (dated September 30, 1991) designed for family reunification and that the mother was not harmed by entry of the goal, "Termination of Parental Rights."

3. The mother further contends in her second enumeration that neither the juvenile court nor DFACS made an exhaustive and thorough attempt to place M. R. with a relative after termination of her parental rights. Appellate counsel for DFACS submits no argument in opposition to this contention.

"If, upon the entering of an order terminating the parental rights of a parent, there is no parent having parental rights, the court shall first attempt to place the child with the child's extended family or with a person related to the child by blood or marriage. An exhaustive and thorough search for a suitable family member shall be made by the court and the Department of Human Resources in attempting to effect this placement. A placement effected under this paragraph shall be conditioned upon the family member who is given permanent custody or who is granted an adoption of the child agreeing to abide by the terms and conditions of the order of the court." OCGA § 15-11-90 (a) (1).

It is undisputed that the biological father has had no meaningful contact with M. R. since the child's birth and that the father's whereabouts was unknown at the time of the termination hearing. Further, the transcript of the termination hearing shows that the juvenile court judge asked the maternal grandmother if she could help the

mother care for M. R. and that the grandmother responded that she could. However, the undisputed evidence shows that M. R. and the mother were residing with the maternal grandmother and uncle in the unsafe and unsanitary apartment at the time the child was taken into protective custody. Further, the grandmother indicated at the termination hearing that her assistance may be limited due to her work schedule and that the small size of the two-bedroom apartment she and the mother were then sharing may pose difficulties. In light of this evidence, proof that the child would remain in a safe and stable foster home upon termination of the mother's parental rights and evidence of the foster parents' intent to adopt the child, we find no abuse of discretion in failing to place the child with a family member (the maternal grandmother or the biological father) upon termination of the mother's parental rights. See OCGA § 15-11-90 (a) (2).

4. In her final enumeration, the mother contends the juvenile court erred in terminating her parental rights in light of evidence that she "made excellent progress before the termination trial."

"(T)he past conduct of the parent is properly considered by the court in determining whether such conditions of deprivation are likely to continue. (Cits.)" *In the Interest of J. L. Y.*, 184 Ga. App. 254, 257 (361 SE2d 246) (1987). In the case sub judice, there is evidence that the mother resided in the same location with the maternal grandmother for at least six months before the termination hearing and that during this period the mother had a full-time job. However, there is no indication that the mother was then ready or able to provide basic care for M. R. In light of this evidence and evidence of the mother's consistent failure to provide a safe and adequate home for the child for more than a year while the child was in protective custody, we find no abuse of discretion in terminating the mother's parental rights, despite evidence of improvement in the mother's lifestyle.

*Judgment affirmed. Pope, C. J., and Smith, J., concur.*

DECIDED JUNE 7, 1994.

*George Robinson*, for appellant.
*Michael J. Bowers, Attorney General, William C. Joy, Senior Assistant Attorney General, Teresa E. Lazzaroni, Assistant Attorney General, The Cheeley Firm, Joseph E. Cheeley III*, for appellee.