A97A1160. IN THE INTEREST OF M. E. C., a child.
(491 SE2d 107)

BEASLEY, Judge.

Claiming insufficient evidence, Misty Lynn appeals the termination of her parental rights to her son M. E. C., born May 30, 1988. The child's father had surrendered his parental rights to the child. Because the trial court was authorized to conclude that there was clear and convincing evidence in favor of termination, we affirm.

In November 1994, after hearings, the juvenile court found the child to be deprived and, with the consent of Lynn, transferred his legal custody to Chatham County DFACS. This order was renewed three times, but Lynn consistently failed to comply with the court's reunification plan. In March 1996, DFACS filed a termination petition, which the court granted after two days of hearings in June 1996.

1. "Under OCGA § 15-11-81 (a), the considerations for terminating parental rights involve a two-step process. [Cit.] The trial court must first determine 'whether there is present clear and convincing evidence of parental misconduct or inability.' OCGA § 15-11-81 (a). Such conduct or inability may be proved by showing, inter alia, that (1) the child is deprived; (2) such deprivation is caused by the lack of proper parental care or control by the parent in question; (3) the deprivation is likely to continue; and (4) the 'continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.' OCGA § 15-11-81 (b) (4) (A) (i)-(iv)." *In the Interest of E. C.*, 225 Ga. App. 12, 14 (482 SE2d 522) (1997). A "deprived child" is one who is "without proper parental care or control." OCGA § 15-11-2 (8).

"[I]n determining whether there is a lack of 'proper parental care and control,' the court may consider several factors, including the parent's '(e)xcessive use of . . . narcotic or dangerous drugs or controlled substances with the effect of rendering the parent incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of the child,' as well as 'physical, mental, or emo-

tional neglect of the child or evidence of past physical, mental, or emotional neglect of the child or of another child by the parent. OCGA § 15-11-81 (b) (4) (B) (ii), (v)." *In the Interest of E. C.*, supra at 14. Other factors include whether the parent has provided for the care and support of the child as required by court order and whether the parent has complied with a reunification plan ordered by the court. OCGA § 15-11-81 (b) (4) (C) (ii), (iii). These latter two factors focus primarily on the year preceding the filing of the termination petition. Id.

"Once the trial court establishes [parental misconduct or inability], the second part of the test for determining whether parental rights should be terminated is whether such termination 'is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child who is the subject of the proceeding, including the need for a secure and stable home.' OCGA § 15-11-81 (a)." *In the Interest of E. C.*, supra at 14.

" 'The standard of review of a juvenile court's decision to terminate parental rights is "whether after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost." [Cits.]' [Cit.]" Id. at 13-14. See OCGA § 15-11-86 (parental rights shall be terminated only by clear and convincing evidence); *Santosky v. Kramer*, 455 U. S. 745, 758-759, 769 (102 SC 1388, 71 LE2d 599) (1982). " 'The reviewing court is to defer to the lower court in the area of factfinding and should affirm unless the appellate standard of review, here the rational factfinder test, is not met.' [Cit.]" *In the Interest of E. C.*, supra at 19. See *In the Interest of T. B. R.*, 224 Ga. App. 470, 472 (480 SE2d 901) (1997); *In the Interest of R. N.*, 224 Ga. App. 202 (480 SE2d 243) (1997); *Blackburn v. Blackburn*, 249 Ga. 689, 694 (292 SE2d 821) (1982).

(a) *Deprivation.* Following three days of hearings in 1994 at which Lynn and her counsel were present, the juvenile court determined (with Lynn's consent) that the child was deprived and transferred temporary legal custody to the Chatham County DFACS. The deprivation order was renewed and was not appealed. "Therefore, [Lynn is] bound by this finding of deprivation and the first factor is satisfied. [Cits.]" *In the Interest of T. B. R.*, supra at 473 (1) (a). See *In the Interest of E. C.*, supra at 14-15; *In the Interest of R. N.*, supra at 203; *In the Interest of L. M.*, 219 Ga. App. 746, 748 (2) (466 SE2d 887) (1995).

Even without this unappealed finding, there is clear and convincing evidence that the child was deprived and still would be deprived if he were living with Lynn. In August 1994, Lynn and a male friend took then six-year-old M. E. C. boating, and the boat sank. Lynn left the child on a marsh and floated to seek help. Lynn

claimed she drifted for 17 hours before reaching land and asked a man to take her home, which he did. She napped for several hours and then she telephoned someone to rescue M. E. C. and her friend. M. E. C. was taken to stay with a relative, who discovered burns on his groin area, wrists, buttocks, and waist. M. E. C. felt abandoned by his mother and angry toward her.

Later in 1994, a psychologist discovered that the child had been sexually abused by an uncle and that Lynn had disbelieved the child and done nothing. The psychologist diagnosed M. E. C. with attention deficit disorder and an adjustment disorder with depressed mood. Acknowledging these facts and that she had a history of unstable home environments which aggravated M. E. C.'s psychological problems, Lynn agreed to the deprivation order transferring temporary custody to DFACS.

The court allowed Lynn to have physical custody on condition that she comply with a case plan approved by the court. It required Lynn to maintain a stable home; maintain financial stability; maintain a lifestyle free of alcohol and drugs; learn and utilize enhanced parenting skills, including non-physical forms of discipline; participate in individual counseling and family counseling with M. E. C.; abide by all public ordinances and probationary conditions (she was serving probation for an earlier drug conviction); visit M. E. C.; and pay $10 per month in child support. She was also ordered to submit to random drug tests. Two weeks later Lynn returned custody of M. E. C. to DFACS, claiming she was experiencing difficulties in managing the child's behavior and was moving between friends' residences. The deprivation order was renewed three times. In those renewals the court among other things ordered Lynn to participate in a residential substance abuse program.

Other evidence from both before and after the deprivation order reflects deprivation. In 1996 the psychologist diagnosed M. E. C. with an adjustment disorder with mixed emotional features; Lynn has repeatedly stated she wants an aunt to adopt the child; she told the child in therapy sessions that men are more important to her than he is; she changed her residence more than twenty-five times between 1994 and 1996, living with boyfriends, friends, and relatives, often in trailers and motels; she has abused alcohol and drugs both before and after the deprivation order; in violation of her probation and the case plan, she has been charged with three DUIs and convicted and served prison time for at least two; she has been married five times, twice before the previous marriage had ended; she currently lives with a man whom she hopes to marry; she has not complied with other probationary conditions from the drug conviction; and she falsely told the child months prior to the termination hearing that her parental rights had already been terminated, that he would

never see her again, and that he was going to be immediately forced out of the foster home, which greatly upset the child.

(b) *Cause of deprivation.*

(1) "[C]hronic unrehabilitated abuse of intoxicating liquors or . . . controlled substances" supports a finding that the deprivation was caused by a lack of proper parental care or control. OCGA § 15-11-81 (b) (4) (B) (ii). Despite Lynn's history of alcohol and drug abuse, and despite having been ordered to obtain treatment, she has consistently refused treatment and has denied having a problem. See *In the Interest of J. M. C.*, 201 Ga. App. 173 (410 SE2d 368) (1991); *In re G. M. N.*, 183 Ga. App. 458 (359 SE2d 217) (1987); *In the Interest of A. O. A.*, 172 Ga. App. 364 (323 SE2d 208) (1984). On five occasions she refused to submit to court-ordered random drug tests. See *In the Interest of M. J. T.*, 217 Ga. App. 356, 357 (457 SE2d 265) (1995) (failure to submit to court-ordered random drug tests resulted in termination of parental rights).

(2) Current or past physical, mental, or emotional neglect of the child is another consideration in determining lack of proper parental care or control. OCGA § 15-11-81 (b) (4) (B) (v). In addition to the boating incident which resulted in severe physical and emotional injury to the child, Lynn told him men take precedence over him, she did not believe him when he complained to her of sexual abuse by an uncle who had abused others, and she failed to attend half of the 50 court-ordered and agreed-upon counseling visits with the child and a counselor, in disregard of repeated advice on the importance of these visits to her son's emotional well-being. For eight of the twenty-five visits she did attend, she was either late or left early. M. E. C., who looked forward to these visits with great anticipation, wet his pants and became dejected when she would not appear.

Predictably, during the first day of the termination hearing, Lynn committed to attend a counseling visit scheduled for the very next day; at the continuation of the hearing the next week, she conceded she once again failed. See *In the Interest of E. C.*, supra at 15; *In the Interest of A. O. S.*, 189 Ga. App. 860, 861 (377 SE2d 870) (1989); *In the Interest of M. M.*, 207 Ga. App. 722, 725 (1) (429 SE2d 132) (1993) ("mother . . . made no real effort to visit"); *In re G. M. N.*, supra at 460 (mother canceled many planned visitations).

(3) A third consideration is whether the parent during the year or longer prior to the filing of the petition of termination "provide[d] for the care and support of the child as required by law or judicial decree." OCGA § 15-11-81 (b) (4) (C) (ii). Lynn made only sporadic payments of the required $10 per month both prior to and after the termination petition was filed. See *In the Interest of E. C.*, supra at 13 (mother failed to make $25 a month payments); *In the Interest of A. S. M.*, 214 Ga. App. 668, 672-673 (448 SE2d 703) (1994) (mother

failed to make nominal support payments); *In the Interest of A. O. A.*, supra at 365 (mother failed to make $5 a month payments); *In the Interest of A. O. S.*, supra at 861 (mother failed to make $5 a month payments).

(4) A fourth consideration is whether in the year or longer prior to the filing of the termination petition, the parent "compl[ied] with a court ordered plan designed to reunite the child with the parent." OCGA § 15-11-81 (b) (4) (C) (iii). Lynn fully failed. She did not remain alcohol- and drug-free. She did not submit to random drug screening. She did not establish a stable environment but moved more than twenty-five times in less than two years and now lives in a house with numerous adults moving in and out. She attended only half of the scheduled counseling visits with the child. She refused to undergo the drug and alcohol treatment mandated by the court and the plan. She failed to make the child support payments. Lynn herself admitted she had not complied with the reunification plan. See *In the Interest of M. R.*, 213 Ga. App. 460, 464 (1) (a) (444 SE2d 866) (1994) (mother failed to comply with reunification plan); *In the Interest of J. D. D.*, 215 Ga. App. 68, 70 (449 SE2d 655) (1994) (mother drank in violation of reunification plan); *In the Interest of A. S. M.*, supra at 672-673 (mother failed to get treatment and to pay nominal payments as required by reunification plan).

(c) *Likelihood of continuing future deprivation.* " 'In addition to evidence of present parental misconduct or inability, "evidence of past conduct may be considered in determining whether the deprivation would be likely to continue. . . .' [Cits.]' [Cit.]" *In the Interest of E. C.*, supra at 16. See OCGA § 15-11-81 (b) (4) (A) (iii); *In the Interest of T. B. R.*, supra at 474; *In the Interest of R. N.*, supra at 204. Lynn's past conduct would support such a finding.

Lynn's refusal of the substance abuse treatment ordered by the court demonstrates that change cannot be realistically anticipated. See *In the Interest of E. C.*, supra at 17. She has yet to comply with the probationary conditions of her drug conviction. She lied to the court about not drinking for a year prior to the hearing, for the court found that two months prior to the hearing an officer found her intoxicated, and she admitted to him she had been drinking alcohol that night. See *In the Interest of E. C.*, supra at 19, n. 5 (mother lied about substance abuse); *In the Interest of J. D. D.*, supra at 70 (mother had abused alcohol "as recently as six months prior to the termination hearing"). Her current boyfriend with whom she lives and on whom she relies for financial support has a recent history of employment instability. Her attendance at AA meetings took place only four to five weeks prior to the termination hearing. See *In the Interest of L. S. F.*, 217 Ga. App. 478, 479-481 (458 SE2d 370) (1995) (changes made just before termination hearing are suspect). A psychologist

testified that Lynn had a very low tolerance for frustration, had only superficial relationships, was hostile toward others, downplayed her problems, and had poor coping skills and lapses in judgment. He recommended the child not be returned to Lynn.

"Although the mother contends she has now changed, judging the credibility of her good intentions was a task for the juvenile court. '(T)he decision as to a child's future must rest on more than positive promises which are contrary to negative past fact.' [Cit.]" *In the Interest of R. N.*, supra at 205 (2). The juvenile court had ample basis for its finding that "Lynn's actions are practically habitual," and that her promises proved empty in the past and lacked credibility.

(d) *Likelihood that continued deprivation will cause serious physical, mental, emotional, or moral harm to the child.* This relates to the factor articulated in OCGA § 15-11-81 (b) (4) (A) (iv). The evidence showed that when DFACS initially gained custody, the child had very poor behavior (kicking, hitting, biting, throwing chairs). While in foster care the child's emotional state and behavior improved significantly. See *In the Interest of E. C.*, supra at 18 (child improved in foster care); *In the Interest of A. O. A.*, supra at 364-365. But he often reverted to bad behavior when Lynn failed to keep commitments to visit. See *In the Interest of E. C.*, supra at 18; *In the Interest of W. W. C.*, 210 Ga. App. 492, 494 (436 SE2d 685) (1993) (child bit other children during periods when he was seeing his natural parents). The psychological evaluations of the child confirmed the harm Lynn's parenting inflicted on M. E. C. The juvenile court also found that the child was being harmed "by virtue of his languishing in temporary foster care." See *In the Interest of T. B. R.*, supra at 476 ("foster care drift" prevents a child from forming emotional attachments with others); *In the Interest of J. M. C.*, supra at 175 (court may consider "the detrimental effects of prolonged foster care").

Without any doubt, a rational factfinder could find clear and convincing evidence of parental misconduct or inability.

2. The second step in this procedure is, as earlier stated, to determine "whether termination of parental rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child who is the subject of the proceeding, including the need for a secure and stable home." OCGA § 15-11-81 (a). " 'Those same factors which show the existence of parental misconduct or inability can also support a finding that the termination of parental rights of the defaulting parent would be in the child's best interest.' [Cit.]" *In the Interest of E. C.*, supra at 18. See *In the Interest of R. N.*, supra at 205.

As in the *E. C.* case, so here: "After viewing the evidence, as presented above, in the light most favorable to the appellee, there is

more than sufficient clear and convincing evidence that the termination of appellant's parental rights is in [M. E. C.'s] best interests. At [eight] years of age, [M. E. C.] is apparently thriving in foster care. [His] physical, emotional, and educational needs are being addressed. Upon termination of appellant's parental rights, [M. E. C.] will become eligible for adoption and will have a realistic possibility of having a secure, stable home." *In the Interest of E. C.,* supra at 18.

*Judgment affirmed. McMurray, P. J., and Smith, J., concur.*

DECIDED AUGUST 6, 1997.

*Mark J. Nathan,* for appellant.

*Michael J. Bowers, Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Stephanie M. Baldauff, Assistant Attorneys General, Beckmann & Lewis, Leo G. Beckmann, Jr.,* for appellee.