A08A0592. IN THE INTEREST OF J. D. et al., children.

(663 SE2d 785)

SMITH, Presiding Judge.

The biological father of J. D. and D. D. appeals from an order terminating his parental rights in his sons.[1] For reasons that follow, we affirm.

On appeal from an order terminating parental rights, we construe the evidence favorably to the juvenile court's ruling and factual findings. *In the Interest of E. K.,* 280 Ga. App. 818, 819 (635 SE2d 214) (2006). We do not weigh the evidence or resolve issues of witness credibility, but merely "determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated." Id.

So viewed, the evidence shows that the father and the children's mother separated in 2002, and the boys remained in their mother's care. In April 2003, when J. D. was three and D. D. was two years old, the father was incarcerated for aggravated stalking.[2] Later that year, while the father was in prison, he learned that his divorce from the mother had been finalized.

The father was released from prison in April 2005 and visited his children almost immediately. According to the father, the mother prevented him from visiting again, although he spoke to them by telephone. He also testified that he sent the mother two money orders totaling over $700, as well as clothing on one occasion in April 2005.

In June 2005, however, the Department of Family and Children Services ("DFACS") obtained a shelter care order for the children after concluding that they lacked adequate care and supervision. J. D. and D. D. were adjudicated deprived with respect to their

---

[1] Prior to the termination hearing, the boys' mother surrendered her parental rights, and she is not a party to this appeal.

[2] Although not completely clear from the record, it appears that the mother of J. D. and D. D. may have been the victim of this crime.

mother later that month, and in November 2005, the juvenile court found the children deprived with respect to their father based on his inadequate housing, failure to support them, and history of domestic violence. The father's reunification case plan required, among other things, that he maintain stable housing and employment, attend and complete parenting classes, visit and establish a bond with the children, pay child support, undergo a domestic violence assessment, complete a violence intervention program, and provide proof that he had completed the various programs and classes to DFACS.

In February 2006, the father was incarcerated again for a probation violation, and he pled guilty to forgery two months later. At the time of the May 2007 termination hearing, the father was still in prison and anticipated a release date in February 2008. He admitted that he had neither seen the children since April 2005 nor spoken with them by telephone since his incarceration in 2006. He further testified that he had not sent them any cards or letters because he could not read or write. In addition, he provided the children no financial support while in prison, and he agreed that his incarceration had negatively impacted his relationship with them.

The father asserted that, as part of his probation requirements, he had completed anger management classes, a domestic violence assessment, and a family violence intervention program. But when asked about topics covered by the family violence program, the father stated: "I can't remember. I can't read or write." In response to questions about whether he had learned anything in the class, he was similarly vague: "Yes, I guess. . . . I mean control and all that." The father admitted that he had not attended a parenting class or provided documentation to DFACS that he completed the family violence and intervention programs.

The DFACS caseworker assigned to the case testified that, to her knowledge, the father had not satisfied any portion of his case plan. To explain his noncompliance, the father asserted that he was unaware of the plan, never received it, and had not been informed of its requirements. He also testified that he did not learn that the children were in DFACS custody until a DFACS employee visited him in jail in February 2006. According to the father, the employee stated during the visit that DFACS planned to seek termination of his parental rights. The evidence shows, however, that the November 2005 case plan listed reunification as the permanency objective, and reunification remained the ultimate goal until July 2006, when the court adopted a concurrent plan for reunification and nonreunification. Approximately one year later, DFACS petitioned to terminate the father's parental rights.

The assigned caseworker testified that J. D. and D. D. have special needs, exhibited violence when they came into DFACS

custody, and required therapy. J. D., however, was thriving in a therapeutic foster home, despite his initial difficulties. According to the caseworker, with the help of therapy, he had transformed from a violent, dangerous child to a calm, loving, and caring boy who worked hard at school and tried "to do his best." Although D. D. had more significant problems and his needs were not being met in his current relative placement, DFACS intended to move him into the therapeutic foster home with J. D.

Ultimately, the caseworker planned to seek an adoptive home where the boys could be placed together, and she was certain that she could find such a home. She further testified that the boys needed stability and that neither had asked about their father. In her opinion, termination would be in the boys' best interests. The guardian ad litem and special advocate appointed for the children similarly concurred with the termination request.

The juvenile court granted the termination petition, finding two alternative reasons for severing the father's parental rights under OCGA § 15-11-94. It concluded that, for a period of at least one year, the father had wilfully and wantonly failed to comply with a court-ordered decree for child support, a ground for termination under OCGA § 15-11-94 (b) (2). Alternatively, it found parental misconduct or inability based upon the factors set forth in OCGA § 15-11-94 (b) (4).

1. We will first address the juvenile court's findings under OCGA § 15-11-94 (b) (4). To terminate parental rights pursuant to this subsection, the juvenile court must employ a two-step process:

> The first step requires a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) lack of proper parental care or control is the cause of the deprivation; (3) such cause of deprivation is likely to continue; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors are satisfied, the court must then determine whether termination of parental rights is in the child's best interest, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure and stable home.

(Footnote omitted.) *In the Interest of E. K.*, supra, 280 Ga. App. at 818-819.

On appeal, the father does not challenge the juvenile court's determination that the children were deprived and that his lack of proper parental care or control caused the deprivation. Instead, he

argues that the evidence failed to establish (a) the cause of the deprivation will likely continue; (b) continued deprivation will likely harm the children; and (c) termination is in the children's best interests.

(a) *Continuing deprivation.* The juvenile court initially adjudicated the children deprived based upon the father's inadequate housing, lack of support, and history of domestic violence. The termination order noted further causes of deprivation, including the father's repeated incarceration, failure to maintain a bond with the children, and failure to meet case plan goals. It also determined that these causes of deprivation were likely to continue. We find no error.

At the time of the hearing, the father had not communicated with his children for almost two years. In fact, he was so disengaged from his parental responsibilities that he purportedly did not realize the children were in DFACS custody between June 2005 and February 2006, undermining any claim that he spoke with them during this period. At the hearing, the father offered excuses for the lack of communication, such as his incarceration, his inability to read and write, and the mother's claimed refusal to permit visitation. But these excuses do not justify his complete failure to maintain contact with the children.

Moreover, although the father asserted that he participated in a family violence program, he could not offer the court any details about what he had learned. He also provided minimal financial support for the children, even when free from prison, and he failed to submit proof to DFACS that he had completed any case plan requirements. We recognize that the father denied knowledge of the case plan and its requirements at the termination hearing. But the juvenile court evidently did not believe this denial, and a judicial review report DFACS presented to the juvenile court in November 2005 indicated that the father had agreed to the plan.

Based upon the evidence before it, the juvenile court could conclude that the cause of the boys' deprivation — particularly the father's failure to maintain a parental bond and his lack of support — was likely to continue. As we found in a similar case,

> [t]he father's incarceration history throughout most of the child's life, his failure to provide for the support of the child, and his lack of interest in the child, all of which were evidence that he cannot be relied on to meet the child's special needs, sufficiently showed that the cause of the child's deprivation was likely to continue and would not be remedied.

*In the Interest of E. K.*, supra, 280 Ga. App. at 820.

(b) *Harm to the children.* The evidence also supports the juvenile court's determination that continued deprivation would harm the children. Both boys exhibited violence and special needs when they entered foster care, requiring therapy and stability. Nevertheless, J. D. was thriving in his therapeutic foster home with the help of his therapist and a dedicated foster mother. D. D. had not progressed as significantly, but DFACS planned to move him into the foster home with J. D., where he could benefit from extensive and consistent therapy. The children's DFACS caseworker also testified with certainty that she would be able to locate a permanent adoptive home for the children.

The evidence further showed that the boys had not seen or heard from their father in almost two years, and neither had inquired about him. The father completely failed to maintain a bond with them, and his questionable effort to address his own violent tendencies raised concerns about his ability to handle his sons' special needs. When asked about his failures, he relied upon excuses, such as his illiteracy. Although he claimed that he would achieve stability upon his release from prison, "judging the credibility of the [father's] good intentions was a task for the juvenile court." (Punctuation omitted.) *In the Interest of M. A. S.*, 284 Ga. App. 102, 106 (1) (a) (4) (643 SE2d 370) (2007). Accordingly, we agree that continued deprivation will likely harm the children. See *In the Interest of L. L. J.*, 289 Ga. App. 567, 569 (657 SE2d 636) (2008).

(c) *Best interests of the children.* Similar evidence supports a finding that termination is in the children's best interests. At the time of the hearing, J. D. was excelling in his placement, and DFACS sought to improve D. D.'s circumstances by moving him into the same therapeutic foster home. Neither boy knew the father, who had been in prison for a significant portion of their lives, and both required stability and permanency.

Although DFACS had not yet identified an adoptive home for the boys, termination of the father's rights would make them eligible for adoption, giving them " 'a realistic possibility of having a secure, stable home.' " *In the Interest of M. E. C.*, 228 Ga. App. 9, 15 (2) (491 SE2d 107) (1997). The trial court, therefore, did not err in severing the father's parental rights pursuant to OCGA § 15-11-94 (b) (4). See id.; *In the Interest of L. L. J.*, supra, 289 Ga. App. at 570.

2. The father also challenges the juvenile court's finding under OCGA § 15-11-94 (b) (2) that he wilfully and wantonly failed to comply for over one year with a court-ordered decree for child support. Among other things, he argues that any lack of compliance resulted from inability "due to his state of incarceration," rather than wilful or wanton behavior.

The record shows, however, that the juvenile court's subsection (b) (2) ruling was *alternative* to its finding of parental misconduct or inability under OCGA § 15-11-94 (b) (4). As discussed above, the evidence fully supported termination pursuant to subsection (b) (4). Thus, regardless of whether the subsection (b) (2) finding was proper, the father was not harmed by any error; the trial court already had a sufficient basis for terminating his parental rights. It follows that this claim of error presents no basis for reversal. See *In the Interest of B. B.*, 267 Ga. App. 360, 361 (1) (599 SE2d 304) (2004) (to obtain reversal, appellant must demonstrate both error and harm).

*Judgment affirmed. Mikell and Adams, JJ., concur.*

DECIDED JUNE 18, 2008.

*Stout, Walling & Atwood, Jordan J. Hendrick*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Elizabeth M. Williamson, Assistant Attorney General, Thompson & Cline, John D. Cline*, for appellee.