A95A0146. IN THE INTEREST OF A. Q. W., a child.
(456 SE2d 284)

BEASLEY, Chief Judge.

The natural mother appeals an order of the juvenile court terminating her parental rights to her son, A. Q. W., who was first placed in the temporary custody of the Georgia Department of Human Resources (the Department) when he was nine months old and who is now nearly seven years of age. Appellant contends that there was not clear and convincing evidence of her misconduct or inability to parent, as is required by OCGA § 15-11-81, and that the termination was not based upon present circumstances.

" 'The statutory criteria for the termination of parental rights is the two-step procedure of OCGA § 15-11-81 (a). First the court determines whether there is clear and convincing evidence of parental misconduct or inability. Second the court considers whether termination is in the best interest of the child. (Cit.) Parental misconduct is determined by finding: 1) the child is deprived; 2) lack of proper parental care or control is the cause of the deprivation; 3) such deprivation is likely to continue or will not be remedied; 4) continued deprivation is likely to cause serious physical, mental, emotional or moral harm to the child. OCGA § 15-11-81 (b) (4) (A). Among the factors which may be considered with regard to a child lacking proper parental care or control are: medically verifiable deficiency of the parent's mental or emotional health of such duration or nature as to render the parent unable to provide adequately for the child's needs; conviction of a felony and imprisonment which has a demonstrable negative effect on the quality of the parent-child relation; (and) physical, mental or emotional neglect of the child. OCGA § 15-11-81 (b) (4) (B). . . .

" 'The standard of appellate review where a parent's rights to his child have been severed is " 'whether after reviewing the evidence in the light most favorable to the appellee [Department], any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost.' " [Cit.]' [Cit.] 'The factfinding and weighing of evidence is to be done in the trial court under the clear and convincing evidence test. The reviewing court is to defer to the lower court in the area of factfinding and should affirm unless the appellate standard of review . . . is not met.' [Cit.]" *In the Interest of B. P.*, 207 Ga. App. 242, 243-244 (427 SE2d 593) (1993).

The evidence viewed in favor of the trial court's judgment showed the following. In March 1989, when A. Q. W. was nine months old, the Department was notified that the child was at the hospital suffering from two skull fractures. At the time of injury A. Q. W., who was appellant's third child, was living with the appellant and her boyfriend, who was not A. Q. W.'s biological father. The whereabouts of the putative father were unknown. Her oldest son, C. W., had been living with appellant's mother since he was about three years old and believed that appellant was his sister. Appellant had placed her middle son for adoption with a couple that her mother knew, and appellant had no contact with him. Appellant claimed no knowledge of how A. Q. W. received the serious injuries. The juvenile court entered an emergency order on March 3, 1989, finding A. Q. W. to be deprived and placing his temporary custody with the Department. On March 6, the Department and appellant entered into a consent order in which A. Q. W.'s temporary legal custody remained with the Department but he physically was placed back in appellant's

home. Appellant agreed to cooperate in protective services' supervision of her home, to provide medical attention to the child as directed by the Department, to attend parenting skills classes as directed, and to forbid her boyfriend to be alone with the child unless approved by the Department. On March 14, the parties executed a consent order which continued in effect the March 6 order except that the child's temporary custody with the Department was terminated.

Approximately three-and-a-half months later, A. Q. W. was hospitalized with severe vomiting. Tests revealed that he had three skull fractures, the two previous ones that had healed as well as an additional fracture. It was also determined that the child had an abdominal obstruction for which he had to undergo surgery. It was the surgeon's opinion that the obstruction could have been caused only by a severe blow to the child's abdomen. On June 30, the juvenile court entered a second emergency order finding A. Q. W. to be deprived as defined in OCGA § 15-11-2 (8) and recommending that his temporary custody be placed with the Department until further order of the court.

On July 31, a 30-day case plan was prepared. It required appellant to visit A. Q. W., pay $30 per month in child support, undergo a psychological evaluation, complete parenting skills classes, and cooperate with the police investigation of A. Q. W.'s injuries. Appellant was present for the development of the case plan and her input was requested but she was uncooperative, belligerent and refused to sign the plan. She did have the psychological evaluation and complete a parenting skills class but she did not pay the child support and exercised only about half of her opportunities for visitation.

Appellant was questioned about A. Q. W.'s injuries and she failed to offer an appropriate explanation about how they were received. Both the police and the Department suspected that the mother's boyfriend had inflicted the injuries but it was never confirmed. It was never proven whether the boyfriend inflicted the harm and appellant was covering up for him, whether appellant herself had intentionally hurt the child, or whether the injuries were the product of severe neglect on the part of one or both of them.

On August 31, the juvenile court made findings that the child was deprived as defined in OCGA § 15-11-2 (8); appellant was incapable of protecting the child from violence; appellant was unfit; continuation in the home would be contrary to the child's welfare; reasonable efforts had been made to prevent or eliminate the need for removal and to make it possible for the child to return to the child's home. It recommended that the child's best interest would be served by continuing his temporary custody with the Department. The court confirmed and adopted these in an order on September 6.

A case review was done on December 7. The goals were for appel-

lant to continue to cooperate with the police investigation which was still pending; appellant and her fiancé continue in therapy; $30 per month in child support be paid; the fiancé would have a psychological examination; and appellant would visit with A. Q. W. twice a month.

The police investigation was never completed because appellant and her boyfriend refused to take polygraphs or otherwise cooperate with the authorities. Child support was not paid. The two continued in therapy for some months and then stopped. The boyfriend did not have the psychological evaluation. In March 1990, appellant was notified that her visitation with A. Q. W. was being reduced to once a month because she was not complying with the case review objectives.

Another case panel review was conducted the following June 20 (1990) and, because it was determined that appellant was not actively working towards having A. Q. W. returned to her home, the Department's goal changed from reunification to termination of parental rights.

In October, appellant petitioned for return of custody. The Department's goal returned to family reunification at a case review conducted in December because it believed that appellant had parted company with her boyfriend, who was still suspected as A. Q. W.'s abuser. The hearing on appellant's petition was combined with an extension of custody hearing seven months later in June 1991. On July 2, the juvenile court entered an order finding that the conditions in the mother's home were unchanged from the time A. Q. W. initially received injuries; that the child would be at risk if he were then returned to the home; that appellant was unfit; and that the child's best interest was served by continuing his temporary custody with the Department.

Another judicial review occurred in December 1991. The accompanying case plan, which was agreed to and signed by appellant, was still aimed at reunification and stated as appellant's goals that she would continue to live independently of her boyfriend; have her mental health care transferred to an area nearer to her residence and receive counseling until no longer recommended by the therapist; seek stable employment and contribute to A. Q. W.'s support; and exercise regular visitation with the child. If appellant complied with the requirements, the goal was to return A. Q. W. to her care in three months. Appellant failed to comply with the terms of the agreement including separating herself from the boyfriend.

Beginning with a subsequent review the same month, the Department's goal reverted to termination of parental rights and permanency for A. Q. W. The Department filed its petition to terminate both parents' rights in June 1993.

By the time of the termination hearing in January 1994, A. Q. W. had bonded with the foster family with whom he had re-

sided for the preceding three years and who had expressed an interest in adopting him. The Department had been unable to find a suitable relative placement for A. Q. W.

At the termination hearing, a psychologist who evaluated appellant described her as having "something like a passive aggressive personality disorder" and as a person that did not "deal well with anger." The doctor expressed concern that appellant "would lose interest" in A. Q. W. because of appellant's own needs and felt it would be difficult to say that appellant would be able to fend for a child or to react appropriately in a parenting situation. The doctor also felt it unlikely that appellant would seek and complete therapy.

Following the hearing, the juvenile court terminated the parental rights of A. Q. W.'s putative father. In the order, the court expressly found that appellant had without justifiable cause failed for a period of over four-and-one-half years to comply completely with the court's orders, reviews, and case plans designed to reunite her with A. Q. W. It concluded, however, that even though the Department had shown by a preponderance of the evidence that termination of appellant's parental rights would be appropriate, the clear and convincing standard had not been met. The court entered a revised case plan requiring appellant to bring current, within thirty days, her outstanding child support obligations; to make an appropriate selection of a counselor within ten days; to exercise the permitted visitation; and to obtain suitable and appropriate stable housing within thirty days. (At the time, appellant was living in a home with her grandmother and an uncle who had abused her as a child.) The order stated, "[t]he Court wishes to make it very clear to the mother, . . . Not completing any portion of the plan, including missing any counseling sessions or missing any child support payments will constitute a substantial deviance from the plan and from the mother's avowed and expressed intent to be reunified with her child under any circumstances."

At the subsequent combined termination hearing and hearing on appellant's motion for overnight and unsupervised visitation, there was evidence that A. Q. W. was getting more negative about appellant with increased visitation with her; appellant ended early all but one of her visits with the child; and appellant often made telephone calls during her visits with the child and took him with her outside to smoke. On one occasion when appellant took the child outdoors to smoke, the caseworker found A. Q. W. hanging over a second-story railing. Although the visits were designed to have appellant and A. Q. W. interact one-on-one, appellant brought her mother and son C. W. with her on one occasion; and when appellant was told the others could not attend the visit, appellant left, stating in front of A. Q. W., "I don't care what you do with [A. Q. W.], I'm leaving. They're going to hear from my attorney."

Appellant failed to fully comply with the revised case plan prescribed after the initial termination hearing. She did not attend all of the required counseling, missed several visits with A. Q. W., and failed to make the required child support payments. The court cited such deviations from its requirements in ultimately terminating appellant's parental rights, but it focused on its concern about the lack of a parental bond between appellant and A. Q. W. It concluded that the overwhelming evidence was that such a bond did not exist and had passed the point of being resuscitated.

The court did not err. Although appellant was given innumerable opportunities to place herself in a position to effectively parent A. Q. W., she failed to do so. Her sporadic attempts can best be characterized as too little and too late.

We are not persuaded by appellant's complaint that the termination of her rights was not based upon present circumstances. First, her past behavior had to be considered in conjunction with the present because it demonstrated a continuing pattern of conduct with regard to her inadequate parenting of the child. Second, her current circumstances were fully assessed by the court and found lacking. Any rational trier of fact would have to conclude that there is clear and convincing evidence of appellant's unfitness and inability to parent A. Q. W.

*Judgment affirmed. Pope, P. J., and Ruffin, J., concur.*

DECIDED MARCH 28, 1995.

*Loretta J. Mirandola,* for appellant.
*Michael J. Bowers, Attorney General, William C. Joy, Senior Assistant Attorney General, Teresa E. Lazzaroni, Kevin M. O'Connor, Assistant Attorneys General, Kathryn C. Reeder, Deborah A. Stone,* for appellee.

