A98A0538, A98A0539. IN THE INTEREST OF D. C. N. K et al., children (two cases).
(501 SE2d 268)

McMURRAY, Presiding Judge.

On February 28, 1997, the Houston County Department of Family & Children Services ("DFACS") filed a complaint with the Houston County Juvenile Court alleging that the female child, D. C. N. K. ("D. K."), then aged two years, and the female child, M. B. C. B. ("M. B."), then aged six months, were deprived "in that they are without proper parental supervision, support or control, and that the deprivation is likely to continue." Specifically, D. K. was deprived by reason of being "beat[en] in the head, face, back, chest, and butt by her mother[, Michelle Bennett, nee Kanaly]. Youth was not given any medical attention for her injuries for over twenty four (24) hours." M. B. was deprived by virtue of this "youth's two year old sister [being] severely beaten by her mother [Michelle Bennett]." According to the complaint, the natural mother is in the Houston County jail; the father of D. K. is appellant Rodney Durrance, whereas the father of M. B. is appellant Terry Bennett. Temporary custody of the children was placed with DFACS, and a subsequent complaint for non-reunification was filed.

The natural mother and both fathers were individually repre-

sented by their own counsel. In October 1996, the natural mother "admit[ted] to a general deprivation . . . ." without admitting the specific allegations of physical abuse of D. K. The children stayed in protective custody until November 18, 1996, when the juvenile court ordered their return to Ms. Bennett and appellant Terry Bennett. Following another episode of violence involving D. K., the juvenile court terminated the parental rights of Ms. Bennett and appellant Rodney Durrance in D. K., and also terminated the rights of Ms. Bennett and appellant Terry Bennett in M. B. Viewed in the light most favorable to the juvenile court's adjudication and disposition, the evidence revealed the following:

According to Inman C. English, M. D., a pediatrician from Warner Robins, around 11:00 p.m. on February 27, 1997, D. K. was brought into the emergency room at Houston County Hospital "unresponsive," and either dazed or comatose, with "multiple bruises over her entire body, including her legs, her arms and her head. She had an evulsion of her ear[; that is, the] ear . . . was torn from the facial skin. She had blood in her right ear canal. She had swelling of her left finger, and it was black and blue and swollen, her index finger on her left hand. . . . [H]er right vaginal area was bruised and swollen. Her left foot was swollen and blue, and she was very stiff, very tight ligaments. She had approximately 30 to 40 bruises, anywhere from a dime to a 50-cent size over her body." Dr. English "did not think [these bruises] probably [occurred at the same time]. [He] thought they had probably occurred within a five, one to five to seven-day period. There were some bruises . . . that were yellow and green[; whereas] some did look red and fresher. . . . [T]hey had to be multiple contusions to different parts of the body. . . ." X-rays revealed D. K. had "a fracture to the clavicle on the right side[,] with some callus formation. . . . [F]or it to have callus formation, it had to be one to two weeks old, or older." The evulsion of her ear was caused by "[g]rabbing or pulling at the ear." In Dr. English's opinion, these contusions were "the result of [D. K.] having been hit or punched[,] or pinched." In her state, the child was "nonresponsive to vocal stimulation or pain stimulation, anything that stimulates the senses." In D. K.'s case, this was caused by "brain swelling." In Dr. English's opinion, there was no accidental explanation for the multiple injuries; rather, D. K. "definitely was abused."

Paola Tumminello, M. D., a neurologist, examined D. K. and found her "malnourished. Her body was covered by multiple bruises[, which, to Dr. Tumminello,] appeared to be of different ages; the bruises on her face were more bluish in color, so being more recent, while some of the bruises on the back appeared brownish in color and older. The bruises were taken from the face, abdomen, chest, back, legs, and arms, and even on the hands. The scalp also appeared to be

bruised. The child had clotted blood on the right, on the outside of the right ear. On examination of the head, the child was noted to have blood in both eyes or what is called a retinal hemorrhage, bilaterally, although they were more marked over the left side." D. K. "had several seizures. They were [a] new onset. The child did not have [a] history of seizures previously. . . . She had several convulsions . . . to the point that she required . . . medication. . . . [T]he child had an EEG. That is a test that evaluates brain activity. That EEG showed slowing of [D. K.'s] brain activity . . ., consistent with the fact that the brain had been injured." On the front left, "beneath the left frontoparietal area, the child had a subdural hematoma[, which] is a collection of blood, and there were two of those. One was on the left frontoparietal area, one was in the occipital area. . . . This, to be explained, is the same type lesion you can find in a person who has had violence against a hard object." D. K.'s brain injury "[d]efinitely . . . will need long-term care. Children that have seizures following a brain insult have an increased risk of epilepsy with seizures for the rest of their lives." In Dr. Tumminello's opinion, D. K. was probably slammed into "[a] wall or a hard object." She further opined that "[r]etinal hemorrhages occur only in two cases. Case number one, but is rarely, when a patient has a bleeding disorder . . . [such as] hemophilia, or clotting disorder. We tested [D. K.] for that; she does not have such a circumstance. The only other thing that causes retinal hemorrhage in a child is Shaken Baby Syndrome. It means that the child has been violently shaken and the head would be rocking back and forth. This causes a rupture of the little veins in behind the retina." Dr. Tumminello "ruled out diabetes, hemorrhagic diabetes, . . . definitely . . . think[ing] it's child abuse."[1]

Sergeant Darren Meadows of the Houston County Sheriff's Department investigated the information that D. K. had been physically abused by her mother. The mother, through counsel, arranged to meet Sergeant Meadows, but arrived only with the infant M. B. Ms. Bennett denied the allegations and told investigators that D. K. was in Savannah with her father, appellant Rodney Durrance. Later that evening, Sergeant Meadows checked again with Ms. Bennett, who privately admitted the "allegations were true. She said she needed some help, and she said she had hurt [D. K.] real bad." Sergeant Meadows took the infant M. B. into protective custody at that time. In a custodial statement, Ms. Bennett told investigators she was "upset about her divorce with Mr. Bennett, and that she had

---

[1] According to the report of Penny G. Putnam, "[D. K.] was released from the hospital March 15, 1997. Beginning March 12, 1997 she began showing marked improvements including regaining partial vision, ability to walk with support and her appetite. Nurses referred to her as their 'miracle baby.' "

struck [D. K.] in the head at least three times with . . . the side of her hand. . . . [A]nd then she got a belt and beat her with the belt." Ms. Bennett further informed Sergeant Meadows that "she had already contacted [D. K.'s father,] Mr. Durrance and the child was on her way back from Savannah, and it would take 3 or so hours for the child to return." When Sergeant Meadows subsequently returned to Ms. Bennett's home, D. K. was there and, after some initial resistance from Ms. Bennett, Sergeant Meadows "took the child to the emergency room at the Medical Center of Houston County." The next morning, Ms. Bennett was formally arrested.

When appellant Rodney Durrance was contacted by the authorities, "he said he hadn't seen his child[, D. K.,] in several months, that he, in fact, was working on Thursday night from . . . 10 o'clock on to 6:00 or 6:30 the next morning which would have eliminated the time he would have had to travel back and forth. . . . There's no way he could have just dropped the child off at 11 o'clock if he had to be at work at 10:00." Appellant Rodney Durrance legitimated D. K. as his lawful child after the February 27, 1997, episode.

Appellant Terry Bennett, the father of M. B., told investigators that, in a previous incident, "Ms. Bennett had hit [D. K.] and blackened her eye, and it had swollen shut. . . ." This incident "occurred during the period of time when they were living together." Another time, when D. K. would not stop crying, Terry Bennett saw as Ms. Bennett "turned around and hit her, and knocked [D. K.] and the chair over. . . . And [Terry Bennett] grabbed ahold of [Ms. Bennett] and pushed her down on the floor, and said, get off of her, leave her alone. Don't touch her again." Yet another time, Terry Bennett "described Ms. Bennett grabbing her [D. K.] by the hair and forcing [a] hot dog into her throat, and the child couldn't breathe, and the child threw it up, and then she [Ms. Bennett] took [D. K.] into the bathroom and threw her into the tub area and started slapping her." According to Martha Ard, social services manager with the Houston County DFACS, it was Terry Bennett who reported to the authorities that D. K. had been abused by her mother in October 1996.

When cross-examined during the March 1997, adjudicatory hearing, Ms. Bennett, the natural mother, invoked her rights against self-incrimination.

Based upon this evidence, as well as that adduced at the October 1996 hearing, the juvenile court adjudicated both children to be "deprived, in that they are without proper parental care and control, and that the deprivation is likely to continue[; and that reunification with the parents] would not be in the best interest of the children." In its dispositional order, the juvenile court determined that both children were deprived, not only because of the physical abuse of D. K. by Ms. Bennett, but also was "based upon the admitted drug use during

that period by [appellant] Terry Bennett[; the fact that] Terry Bennett and [Ms.] Bennett were living together but were not [then] married[;] that drug users frequented the Bennett residence, and that Terry Bennett admitted he provided drugs to other individuals[, including the natural mother, Ms. Bennett]." During the period when Ms. Bennett "kept the child in her room for approximately four days [to conceal D. K.'s blackened eye,] Terry Bennett would not check on the welfare of the child, or intervene in what [Ms.] Bennett was doing to [D. K.]."

With respect to appellant Rodney Durrance, the juvenile court found "he knew at that time that [Ms.] Bennett had abused [D. K.], and that the children were exposed to drug use around [Ms.] Bennett and [appellant] Terry Bennett. Despite this knowledge, [appellant] Rodney Durrance took no action to . . . seek custody of the child at that time; or to maintain any contact with the child to ensure that the child was in good condition, and that her physical, emotional and moral needs were met." The juvenile court further found that "Rodney Durrance knew [D. K.] had been physically abused in October 1996, [but] did nothing to seek visitation with the child until [he legitimated D. K. in] March, 1997; and by this inaction and neglect he exhibited a total lack of care and concern for the child." Moreover, the juvenile court determined that "Rodney Durrance's chronic unrehabilitated use of marijuana would render [him] incapable of providing adequately for the physical, mental, emotional and moral condition and needs of the child." In Case No. A98A0538, Rodney Durrance appeals from the order of the juvenile court terminating his parental rights in D. K., while in Case No. A98A0539, Terry Bennett appeals from the termination of his parental rights in the infant M. B. *Held*:

### Case Nos. A98A0538 and A98A0539

In each case, the respective natural and legal father of the deprived minor enumerates the sufficiency of the evidence to justify forever severing the familial bonds.

"In considering the termination of parental rights, the court shall first determine whether there is *present* clear and convincing evidence of parental misconduct or inability as provided in subsection (b) of this Code section. If there is clear and convincing evidence of such parental misconduct or inability, the court shall then consider whether termination of parental rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child . . ., including the need for a secure and stable home." (Emphasis supplied.) OCGA § 15-11-81 (a). Termination of each father's parental rights in the cases sub judice

was predicated upon findings of parental misconduct or inability under the requirements of OCGA § 15-11-81 (b) (4) (A) (i) through (b) (4) (A) (iv). It is undisputed that neither father ever physically abused either child. Rather, the essence of the evidence shows a form of passive neglect or indifference, in the face of evidence that the mother lied about the true nature of D. K.'s repeated bruisings. We assume, without deciding, that the evidence authorized the juvenile court's determinations that both D. K. and M. B. were deprived, and that such deprivation was caused by the lack of proper parental care or control by the respective fathers, fulfilling the requirements of OCGA § 15-11-81 (b) (4) (A) (i) and (ii).

But OCGA § 15-11-81 (b) (4) (A) (iii) requires that the lack of proper parental care and control causing such deprivation "is likely to continue or will not likely be remedied. . . ." "A finding of [parental] unfitness must be based on present circumstances. *Wright v. Hanson*, 248 Ga. 523, 525 (2) (283 SE2d 882) (1981); *Bozeman v. Williams*, 248 Ga. 606, 607 (285 SE2d 9) (1981)." *In re N. F. R.*, 179 Ga. App. 346, 347 (2), 348 (346 SE2d 121). The salient present circumstance in the two cases sub judice is that D. K. and M. B. will no longer be subjected to the violent rage of the natural mother. Consequently, the primary cause of the lack of proper parental care and control is not at all likely to continue for it has already been remedied. "Due to the staleness of the evidence of [paternal] parental misconduct and the absence of clear and convincing evidence that [any] deprivation is likely to continue, termination of [each father's] parental rights is inappropriate. *McCormick v. Dept. of Human Resources*, 161 Ga. App. 163, 164 (2) (288 SE2d 120) (1982)." *In the Interest of R. U.*, 223 Ga. App. 440, 442 (477 SE2d 864). In Case No. A98A0538, the judgment of the juvenile court adopting the plan for non-reunification and terminating Rodney Durrance's parental rights in his daughter, D. K., is reversed. In Case No. A98A0539, the judgment of the juvenile court adopting the plan of non-reunification and terminating Terry Bennett's parental rights in his daughter, M. B., is reversed. Each case is remanded with direction to establish a plan for reunification, subject to whatever disposition is warranted by future events.

*Judgments reversed with direction. Blackburn and Eldridge, JJ., concur.*

DECIDED APRIL 6, 1998.

*Yancey & Associates, Thomas R. Wilkerson III*, for appellant (case no. A98A0538).
*Carl A. Veline, Jr.*, for appellant (case no. A98A0539).

*Thurbert E. Baker, Attorney General, Jeffrey L. Milsteen, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Stephanie M. Baldauff, Assistant Attorneys General, Williams, Sammons & Sammons, Walter G. Sammons, Jr., Robert E. Hall, Michael J. Moore, Sherry H. Campbell*, for appellee.

