A99A2399. IN THE INTEREST OF T. M. S. et al., children.
(529 SE2d 892)

BARNES, Judge.

Claiming insufficient evidence, the appellant appeals the termination of her parental rights to her two minor children. Because the trial court was authorized to find that there was clear and convincing evidence in favor of termination, we affirm.

1. In reviewing a biological parent's challenge to the sufficiency of the evidence, we determine whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. *In the Interest of A. C.*, 230 Ga. App. 395, 396 (1) (496 SE2d 752) (1998). We do not weigh the evidence or determine witness credibility but defer to the juvenile

which had been requested so that a child could qualify for a school district.
[13] 265 Ga. 189 (454 SE2d 769) (1995).
[14] Id. at 191.

court's factfinding. *In the Interest of L. H.*, 236 Ga. App. 132, 133 (1) (511 SE2d 253) (1999).

Viewed in this light, the record shows that at the time appellant's rights were terminated, she was seventeen and had herself been in the protective custody of the Department of Family & Children Services ("DFACS") since she was six months old. Her children, T. M. S. and C. M. P. L. S., were two years old and nine months old, respectively, at the time of the termination hearing.

When T. M. S. was born on April 24, 1997, appellant was fifteen years old and living with Adelle Amos, a foster mother she had lived with on and off since she was six years old. Within days of his birth, DFACS petitioned the juvenile court for custody of T. M. S. When he was less than one month old, a consent order was entered stipulating that he was deprived. DFACS submitted a case plan to the juvenile court, and the court conditioned reunification upon appellant's compliance "with each and every portion of the plan, including any and all requirements for evaluation and treatment and all requirements for financial child support." This was the first of four case plans developed by DFACS with regard to appellant's children; each case plan had the same basic goals. These goals were for appellant to: (1) maintain contact with her children; (2) attend counseling; (3) continue her education; and (4) have a source of income to support her children.

Appellant's caseworker, Craig Campbell, testified that it was his initial goal to reunite T. M. S. with appellant. He "wanted her to have a chance unlike the chances that she may not have had in her life." In furtherance of this goal, he placed T. M. S. with Amos, the same foster mother charged with appellant's care.

After only two months, Amos told Campbell she was concerned about T .M. S.'s well-being with appellant in the home, and T. M. S. was placed elsewhere. Amos' specific concerns were that appellant "would take the baby out and come home late in the middle of the morning [the next day], and I would ask her not to do that but sometime it would happen again and again and I just felt uncomfortable with that." This would occur two to three times per week.

Appellant's aunt, Thelma Rogers, testified that during this same time period, a friend of appellant's called, told her she had T. M. S., and asked if Rogers could take him. Rogers took care of T. M. S. for a few days before asking appellant's caseworker to pick him up. During this time, Rogers did not know appellant's whereabouts or why appellant's friend had been caring for T. M. S.

Less than a year after T. M. S. was born, appellant became pregnant with C. M. P. L. S., who was born on August 10, 1998. Amos testified that she noticed appellant's morning sickness, asked if she was pregnant, and urged her to obtain prenatal care. Appellant denied that she was pregnant and did not obtain any prenatal care until she

was six months pregnant and could no longer deny the pregnancy. She later told Amos that she tried to conceal her pregnancy because she did not want DFACS to take her baby.

DFACS promptly petitioned for custody of C. M. P. L. S. after her birth, and after a hearing, the juvenile court issued an order on September 18, 1998, finding that C. M. P. L. S. was deprived. In this order, the juvenile court found that appellant "has failed to meet any of the goals of the previous case plans and continues to place her interests and desires ahead of those of her children."

Shortly after C. M. P. L. S.'s birth, appellant left Amos' home and stayed with a friend, Rachona Smith. Smith testified that appellant told her that "everybody was against her," including Amos, and that she needed a place to stay. Smith tried "to give [appellant] some stability" and coached her about what she needed to do to regain custody of her children. Initially, appellant attended her GED classes and went with Smith to visit her children at a day care center. Smith also helped appellant get a job at McDonald's. Appellant never reported for work, however, because she never obtained an identification card, even though her caseworker gave her a copy of her birth certificate and money to obtain the card.

Later, after appellant started seeing a boyfriend, she stopped visiting her children with Smith. She also started disappearing for three or four days at a time. When she came home, she would "take a bath, eat, leave," and stay away for another three or four days. In Smith's opinion, appellant was using marijuana because she would come in high, smelling of marijuana, and had bloodshot eyes and "the munchies." Appellant also stopped going to her GED classes before she was ultimately expelled.

On December 9, 1998, DFACS filed a petition to terminate appellant's parental rights. A copy of this petition was mailed to appellant at Smith's address on December 22, 1998.

In February 1999, Smith removed appellant's clothes from her residence and took them to appellant's caseworker. She testified that she took this action because "[i]t got to the point she wasn't coming [home for] long periods of time so I felt like she didn't need my assistance anymore. . . . And I just didn't want to throw her out or anything like that."

Smith testified that, based on her observations of appellant during the six months appellant lived with her, appellant was not ready to be a parent. Although appellant loves and wants to be with her children, Smith testified that it did not "take much to distract her into doing something different."

In February 1999, appellant returned to Amos' home. Amos testified that she loves appellant, that appellant is "like a daughter to her," and that appellant calls her "Mama." Nonetheless, Amos asked

appellant's caseworker to remove her from her home in February because she did not want to put up with appellant's temper and disobedience anymore. After talking with appellant, Amos agreed that she could continue staying with her but conditioned it on proper behavior. Amos testified that she had no further problems with appellant after this conversation. In the termination hearing held two months later, Amos testified that appellant was still not ready to care for her children.

Dr. William Russell Johnson, a psychiatrist, testified that in 1992, appellant was diagnosed with "borderline personality disorder," and that it was an extremely unusual diagnosis for a nine-year-old child since this condition was normally seen only in adults. The characteristics of this disorder include fluctuations of mood that happen very quickly, extreme anger, and an extreme need for attention based upon fears of abandonment. These characteristics "tend to be lifelong" because the person suffering from it denies having a problem and therefore fails to seek treatment. Dr. Johnson reexamined appellant in February 1999, two months before the termination hearing, and confirmed that she still had a borderline personality disorder. Although the disorder can improve with maturity, medications, and psychotherapy, Dr. Johnson concluded that appellant had made no significant progress with her disorder over the course of eight years. He characterized her problems as "long term" and saw no "short term change in her behavior." At the time of the termination hearing, appellant was six months short of being eighteen years old.

Appellant's caseworker testified that appellant resisted any type of counseling and that his attempts to get her back into counseling in early 1999 failed. Appellant told him at that time that she was not crazy and did not need counseling.

The caseworker further testified appellant was required to work if she was not in school. However, appellant's only jobs were short-term stints at a nonprofit organization, Hardee's (one month), and Winn-Dixie (one week). Her last employment ended in October 1998, six months before the termination hearing.

The trial court admitted, without objection, the report of the Court Appointed Special Advocate (CASA) for both of the children. In this report, the CASA described appellant as a person who is "volatile, combative, manipulative, and unpredictable." Although appellant loves her children, she "has not been able to carry through with what needs to be done to prove herself a mature, competent mother" and "takes no initiative to help herself." She "did not complete Parenting Classes offered by DFACS" and refused to meet with her older child's foster parents, who had offered to help with her parenting skills. She was expelled from the Last Chance Program and permanently expelled from all Georgia school systems in January 1998

for violent behavior. This behavior included cursing at staff, destroying a classroom by overturning furniture, and causing a circuit to blow in the school building.

The CASA testified during the termination hearing that appellant spent a lot of her time, effort, and money on self-centered gratification,[1] instead of her children. She further testified that she did not believe appellant would ever reach the level of maturity necessary to parent her children.

Appellant testified and admitted that she was expelled from the Last Chance Program and that she had completely destroyed a building when she got upset. Nine or ten months later, after the birth of her second child, she enrolled in an adult education class to help her obtain a GED. She was also dismissed from this program after receiving three "write-ups." Another witness testified that appellant returned to her classroom after learning that she was expelled from the program and used "all kinds of abusive language in front of the other students in the classroom."

Appellant further testified that she tried to find a job after her expulsion from the GED program by filling out applications at three or four fast food restaurants while eating out. When asked why she had not made more of an effort to obtain employment, she replied, "I guess because I don't have to." Her response to an inquiry about what she did during the day was, "Besides sleep?" She admitted that she did not go out to look for a job, go to school, or attend counseling. She also acknowledged that she knew these were goals in her case plan.

She further testified that she did not think her children should, like her, remain in a series of foster homes. In her mind, this would not be necessary because she was ready to be a responsible parent. When asked to tell the judge why he should give her a chance to prove that she could be a good parent, her answer demonstrated that she wanted a chance based upon her own emotional needs, not those of her children. She wanted her children to know her; she did not want them to be told that she did not want to be with them; she did not want them to hate her; and she wanted to be a better mother than her own mother had been. Her need for children to fulfill her own emotional needs was also demonstrated by her admitted statement to a school counselor that she would simply have two more children if these were taken away from her.

2. Determining whether parental rights should be terminated involves a two-step analysis. In the first step, the court must first find parental misconduct or inability. That finding must be supported by clear and convincing evidence that: (a) the child is deprived; (b)

---

[1] Examples given by the CASA include pedicures, manicures, and hair salon visits.

lack of proper parental care or control caused the deprivation; (c) the cause of the deprivation is likely to continue; and (d) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-81 (b) (4) (A) (i)-(iv); *In the Interest of L. H.*, supra, 236 Ga. App. at 132-133 (1). Further, "[e]vidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in her natural child; clear and convincing evidence of *present* unfitness is required." (Citations and punctuation omitted; emphasis in original.) *In the Interest of R. A.*, 226 Ga. App. 18, 20 (486 SE2d 363) (1997); see also *In the Interest of D. C. N. K.*, 232 Ga. App. 85, 90 (501 SE2d 268) (1998).

If these four factors exist, then the court must take the second step and determine whether terminating parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home. OCGA § 15-11-81 (a).

In this case, appellant asserts the juvenile court abused its discretion when it terminated appellant's parental rights because "there was no showing that the deprivation is likely to continue or could not be remedied." We disagree. The record shows that appellant had a longstanding psychological disorder for which she consistently refused or resisted counseling. A psychiatrist testified that her psychological problems were "long-term" and unlikely to be remedied without psychotherapy. Several witnesses with a close relationship to appellant testified that she was not ready to be a parent, and appellant's own conduct demonstrates the same. Although appellant's personal behavior in her foster mother's home improved in the two months before the termination hearing, she made no progress on her case plan goals for reunification with her children. She made no consistent or sustained effort to obtain or maintain employment to support her children and contended at the termination hearing that it was not her responsibility to do so. This evidence supports the juvenile court's conclusion that the children's deprivation was likely to continue. See *In the Interest of S. L. W.*, 221 Ga. App. 509, 512 (4) (471 SE2d 579) (1996), overruled on other grounds, *In the Interest of C. W. S.*, 231 Ga. App. 444, 448 (3) (498 SE2d 813) (1998). Appellant's sporadic attempts to place herself in a position to adequately parent her children "can best be characterized as too little and too late." *In the Interest of A. Q. W.*, 217 Ga. App. 13, 18 (456 SE2d 284) (1995).

3. In her remaining enumeration of error, appellant contends the juvenile court abused its discretion because no clear and convincing evidence showed that termination of appellant's parental rights was in the best interests of the children.

After a finding of parental misconduct or inability, the trial court must determine whether termination is in the best interest of the

child, taking into consideration the physical, mental, emotional, and moral condition and needs of the child, including the need for a secure and stable home. OCGA § 15-11-81 (a). "Those same factors which show the existence of parental misconduct or inability can also support a finding that the termination of parental rights of the defaulting parent would be in the child's best interest." (Citations and punctuation omitted.) *In the Interest of E. C.*, 225 Ga. App. 12, 18 (482 SE2d 522) (1997). Additionally, the juvenile court is authorized to consider the child's need for a stable home and the detrimental effects of prolonged foster care. *In the Interest of M. L.*, 227 Ga. App. 114, 117 (488 SE2d 702) (1997).

The facts set out above and our review of the entire record show that clear and convincing evidence supports the juvenile court's finding that termination of appellant's parental rights would be in the best interests of her children.

*Judgment affirmed. Blackburn, P. J., and Eldridge, J., concur.*

DECIDED FEBRUARY 21, 2000.

*Steven L. Morgan*, for appellant.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Laura W. Hyman, Assistant Attorneys General, James A. Chamberlin, Jr.*, for appellee.