A98A1399. IN THE INTEREST OF N. J. W. et al., children.
(503 SE2d 366)

ELDRIDGE, Judge.

Alton Wooten appeals the juvenile court's termination of his parental rights to N. J. W., A. W. III, J. D. K., and R. W., claiming that the evidence was insufficient to support the termination. We affirm.

"On appeal, this Court must determine whether, after reviewing the evidence in a light most favorable to the lower court's judgments, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met." (Citation and punctuation omitted.) *In the Interest of V. S.*, 230 Ga. App. 26, 27 (495 SE2d 142) (1997).

In February 1994, while the Wooten family was living in Monroe County, A. W. III swallowed some hot ashes and damaged his trachea. The family subsequently moved to Butts County, and the Butts County Department of Family & Children Services ("DFACS") first came into contact with the Wooten family in June 1994, when it received a report that A. W. III's parents were not giving him proper medical attention, i.e., that he was not keeping his appointments with the nurse and he was not getting his medication. The case was confirmed for medical neglect and DFACS also found that the home was unsanitary. There was dog feces in the house and the home was dirty. Emergency custody of A. W. III was granted to DFACS until the parents cleaned up the home. A. W. III was then placed back in the home. The family was unable to pay their rent and utilities because of Mr. Wooten's sporadic employment. DFACS assisted the Wootens in payment of their rent and utilities and provided counseling services and parenting aid services in the home. The case was closed in June 1995.

In August 1995, DFACS received a report that the children were not receiving proper medical attention, i.e., R. W. was reported to have severe diaper rash and J. D. K. had an untreated dog bite on his face. It was reported that there was no food in the home and that there was drug use in the home. DFACS found that R. W. did, in fact, have severe diaper rash and that J. D. K. had been bitten by a dog. A. W. III's immunization shots had not been updated. DFACS instructed the parents to take J. D. K. and A. W. III to the doctor. The house was filthy and DFACS instructed the parents to clean it.

In October 1995, DFACS received a report that R. W. had severe diaper rash, the children were improperly dressed for the weather, and there was drug use in the home. The investigation revealed that

R. W. did, in fact, have a severe diaper rash. The family moved to another home in Butts County during this time, and the case was closed and unconfirmed for neglect.

In January 1996, DFACS again received a report that the home was dirty, the children had head lice, the children were dirty, N. J. W. was not attending school, and the children were sick. The investigation revealed that the children were sick and had not been taken to a doctor, the children had been wearing the same clothing for several days, and the home was very dirty and unsafe.

During its investigation of the January 1996 report, DFACS received another report on February 1, 1996. N. J. W. was attending school dirty, smelling of fecal matter, and hungry. It was reported that N. J. W. was falling asleep in class. The case was opened for services, and a safety plan was developed with the parents which advised them to take the children to the doctor. Eight days passed before the parents complied with the safety plan and took the children to the doctor.

Subsequently, in February 1996, the mother was hospitalized with hepatitis which she contracted from the well that provided the family's drinking water. On her release from the hospital on February 8, 1996, the doctor instructed her to have the children tested. When the parents failed to follow the doctor's instructions, another case plan was developed on March 8, 1996, directing that all the children be taken to the doctor to be tested for hepatitis. The children were taken to the doctor on March 11, 1996.

On April 10, 1996, at DFACS' request, the juvenile court conducted a hearing, and the case plan set up by DFACS was made an order of the court. The court-ordered case plan required the parents to: provide a stable, clean, and safe home for the children in which no other family lived, with the exception of Mr. Wooten's mother and her son; do the family's laundry at least twice a week; provide necessary medical care for the children and to participate with the Transitional Family Services to acquire the skills necessary to recognize when one of the children's health required medical attention; locate employment and provide support for themselves and their children; provide for N. J. W.'s educational needs by sending her to school on a regular basis dressed in clean neat clothes, making sure she was in bed by 9:00 p.m., and attending all school conferences; and to cooperate with DFACS. Mr. Wooten was further required to remain alcohol and drug free and obtain treatment for substance abuse.

Even though DFACS provided the parents with financial assistance, assisted them with employment searches and in obtaining treatment for substance abuse, and provided therapists in their home to assist them with parenting skills, the parents failed to comply with any provisions of the court-ordered case plan.

On June 12, 1996, after a juvenile court hearing, the children were placed in the temporary custody of DFACS, and a new case plan was entered. This case plan required the parents to cooperate with the agency; obtain income that meets their children's needs; obtain a hazard-free residence with enough room for all the children and maintain that residence for at least six months; apply and demonstrate appropriate parenting skills which insured the safety and health of the children; maintain regular contact with the children; provide child support for the children while in foster care; and maintain sobriety and remain drug free.

After temporary custody was awarded to DFACS, DFACS attempted to place the children with relatives. DFACS did not consider the paternal grandmother's home appropriate because she had lived with the Wootens during the time the children were neglected and she had a history of alcohol abuse. The children were placed in foster care. After two days, the foster parents requested the children be moved because of the children's behavior. Two of the children, N. J. W. and J. D. K., were then placed with a relative, Ms. Shannon. The paternal grandmother continuously interfered with their care and took the children home with her, even though DFACS had requested that she not do so. N. J. W. and J. D. K. were then placed with Mr. Wooten's half-brother, Mr. Herring, and his wife on August 13, 1996. Within the week, the Herrings were expressing concern about being able to properly care for the children because of interference by the parents and the paternal grandmother. N. J. W. and J. D. K. were placed back into foster care.

The parents did not comply with the case plan ordered on June 12, 1996, even though DFACS continued to offer the parents counseling sessions on developing parenting skills and transportation for job searches. Mr. Wooten failed to complete either the outpatient or inpatient drug programs he entered. Contempt hearings were held on two occasions due to the parents' refusal to comply with the case plan. At the second hearing in October 1996, a new case plan was entered which was identical to the case plan of June 12, 1996. The parents did not comply with the October 1996 case plan either, except that Mr. Wooten began visiting with the children on a regular basis.

On December 3, 1996, a judicial citizen's review panel was held. Both parents attended and signed the case plan. The same goal plans were incorporated, and the panel recommended that the children remain in foster care.

Thereafter, in December 1996, the mother separated from Mr. Wooten. DFACS lost contact with the mother until February 1997, when they located her in Macon living with another man.

On May 6, 1997, a second judicial citizen's review panel was held. Mr. Wooten attended and signed this review; the children's

mother did not attend. The panel recommended that the children continue in foster care and that parental rights be terminated, as the parents had not met any of the goals. The panel's recommendations were adopted by court order. Based on the recommendations of the citizen's review panel, DFACS filed a petition for termination of parental rights on July 17, 1997.

Mr. Wooten entered a guilty plea on September 8, 1997, to two counts of burglary and six counts of forgery in the first degree, offenses which occurred between March 17, 1997 and June 24, 1997. He was sentenced on each count concurrently to fifteen years to serve ten years, balance on probation.

On October 16, 1997, prior to a hearing on the termination of parental rights, the mother of the children voluntarily surrendered her rights to the children and signed a final release for adoption. After a hearing on January 14, 1998, Mr. Wooten's parental rights were terminated. He appeals.

"The statutory criteria for the termination of parental rights is the two-step procedure of OCGA § 15-11-81 (a). First the court determines whether there is clear and convincing evidence of parental misconduct or inability. Second the court considers whether termination is in the best interest of the child. Parental misconduct is determined by finding: 1) the child is deprived; 2) lack of proper parental care or control is the cause of the deprivation; 3) such deprivation is likely to continue or will not be remedied; 4) continued deprivation is likely to cause serious physical, mental, emotional or moral harm to the child. OCGA § 15-11-81 (b) (4) (A)." *In the Interest of A. M. V.*, 222 Ga. App. 528, 529 (474 SE2d 723) (1996).

"In determining whether a child is without proper parental care and control, the juvenile court was authorized to consider the conviction of the parent of a felony and imprisonment therefor which as a demonstrable negative effect on the quality of the parent-child relationship. OCGA § 15-11-81 (b) (4) (B) (iii)." *In the Interest of T. M. R.*, 217 Ga. App. 461, 462 (458 SE2d 148) (1995). "A conviction of a crime and incarceration does not always compel a termination of parental rights but will support such a ruling when adequate aggravating circumstances are shown to exist." Id.

1. (a) As Mr. Wooten "did not appeal the original order of the juvenile court finding that [his] children were deprived, [he] cannot now complain about that finding. [Cit.]" *In the Interest of V. S.*, supra at 29.

(b) Furthermore, even though Mr. Wooten asserts that he loves his children and his children love him, the juvenile court had sufficient evidence to determine that Mr. Wooten's inability to adequately care for his children was the cause of their deprivation. It is undisputed that the children were often dirty and had head lice, that they

did not receive necessary medical care, that they often went hungry, and that the children's living conditions were deplorable. After the children were placed in foster care, Mr. Wooten never paid any child support as ordered. Mr. Wooten's present incarceration, his past record showing his inability to maintain a job, and his failure to admit his addiction to drugs and alcohol and complete the ordered treatment for his addiction provides a clear and convincing basis for the finding that the children's deprivation was caused by his inability to care for them.

(c) "The evidence also supports the finding by the juvenile court that the deprivation is likely to continue. Although past deprivation is not sufficient for termination without a showing of present deprivation, the court can consider a parent's past conduct in determining whether such conditions of deprivation are likely to continue. The court was entitled to infer from the evidence that, despite the best efforts of DFACS . . ., the same pattern of deprivation would continue each time the children were reunited with [Mr. Wooten]." (Citation and punctuation omitted.) *In the Interest of V. S.,* supra at 29.

(d) Further, the juvenile court's finding that the children are likely to be seriously harmed by the continued deprivation is supported by the evidence in the record. The children suffered physical, emotional, and developmental setbacks while under Mr. Wooten's care. The record shows that the children did not receive adequate medical care and lived in deplorable conditions. Their basic needs went consistently unmet. The three oldest children have learning disabilities, and N. J. W. and J. D. K. have below average performance in school. All of the children exhibited behavioral problems when they were first placed in foster care. N. J. W. and J. D. K. are still exhibiting behavioral problems, but are improving in foster care. Thus, the evidence is clear and convincing that the children have already been harmed and will continue to be harmed unless Mr. Wooten's parental rights are terminated.

2. Finally, "[i]n determining that terminating the [father's] parental rights would serve the best interests of the children, the court properly concerned itself with the need for stability in their lives." *In the Interest of R. N.,* 224 Ga. App. 202, 205 (480 SE2d 243) (1997). The children are presently in foster care and are doing well. All four of the children have realistic prospects for being adopted. Mr. Wooten is presently incarcerated in the prison system serving a sentence of fifteen years to serve ten. At a minimum, he will have to serve 24 months and will emerge as a single parent with no real job skills and a history of drug and alcohol abuse. While Mr. Wooten testified that he is attempting to get his GED and has signed up for counseling in prison in an attempt to straighten out his life, "the decision as to a child's future must rest on more than positive

promises which are contrary to negative past fact." (Citation and punctuation omitted.) *In the Interest of D. I. W.*, 215 Ga. App. 644, 646 (451 SE2d 804) (1994). Further, "[t]he same factors which prove a parent's inability to properly raise [his] children may also serve to show that termination of the parental rights would be in the children's best interests. [Cit.]" *In the Interest of V. S.*, supra at 30. Thus, there is more than sufficient clear and convincing evidence that termination of Mr. Wooten's parental rights is in the children's best interest.

*Judgment affirmed. Blackburn, J., and Senior Appellate Judge Harold R. Banke concur.*

DECIDED JUNE 26, 1998.

*Kelley S. Powell*, for appellant.

*Thurbert E. Baker, Attorney General, William C. Joy, Dennis R. Dunn, Senior Assistant Attorneys General, Shalen A. Sgrosso, Stephanie M. Baldauff, Assistant Attorneys General, W. Ashley Hawkins*, for appellees.