513 S.E.2d 513 (1999)
236 Ga. App. 770
In the Interest of C.J.V. et al., children.
Nos. A98A2338, A98A2339.
Court of Appeals of Georgia.
March 4, 1999.
*514 David C. Butler, Marietta, for appellant (case no. A98A2338).
Baskin & Baskin, Brenda Godfrey, Bobby G. Adkins, Jr., Marietta, for appellant (case no. A98A2339).
Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Stephanie B. Hope, Assistant Attorneys General, Sanders B. Deen, Marietta, for appellee.
RUFFIN, Judge.
These are related appeals from an order of the juvenile court of Cobb County, terminating the father's parental rights to C.J.V., and the mother's parental rights to C.J.V., A.B., and T.B.[1] Both appellants challenge the sufficiency of the evidence supporting this order. Because there is clear and convincing evidence *515 which supports the terminations, we affirm.
On appeal, we must determine "whether, after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent[s'] right to custody should be terminated. On appeal, this Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met." (Citations and punctuation omitted.) In the Interest of C.L.R., 232 Ga.App. 134(1), 501 S.E.2d 296 (1998).
Before terminating a parent's rights, a juvenile court, pursuant to OCGA § 15-11-81(a), must employ a two-step procedure. In the Interest of C.L.R., supra. "First, the court shall determine whether there is present clear and convincing evidence of parental misconduct or inability as provided by OCGA § 15-11-81(b). Secondly, if there is clear and convincing evidence of such parental misconduct or inability, the court shall then consider whether termination of parental rights is in the best interest of the child. Parental misconduct or inability is found where (1) the child is deprived, (2) the lack of proper parental care or control by the parent in question is the cause of the child's deprivation, (3) the cause of deprivation is likely to continue or will not likely be remedied, and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-81(b)(4)(A)." (Citations and punctuation omitted.) Id.
In these cases, the evidence shows that in April 1996, the police placed then one-year-old C.J.V., four-year-old A.B., and six-year-old T.B. in protective custody after finding them alone in a motel room where they lived with appellants. When the police found A.B., her wrists and ankles had been bound with tape and were connected with a shoestring, forcing her into a fetal position. A.B. had a cracked shoulder, abrasions on her wrists and ankles, and a fading black bruise on the back of her thigh. The appellant-father was arrested and pled guilty to felony cruelty to children and was sentenced to three years, to be served on probation. He also pled guilty to three counts of reckless conduct and was sentenced to one year, to be served on probation. On May 29, 1996, the juvenile court awarded temporary legal custody to the Department of Family & Children Services (DFCS) upon adjudicating the children deprived on the basis of the motel incident; the father's incarceration for cruelty to children, reckless conduct, and contributing to the delinquency of a minor; and the mother's agreement to allow the children to remain in protective custody.
Following a hearing on July 7, 1997, the juvenile court ordered the suspension of visitation between the children and their parents based on "the seriousness of the trauma they suffered" and "the personal observations of the caseworker during the visitations of the children with their mother." Thereafter, following a hearing on November 14, 1997, the court extended temporary custody to DFCS for an additional year. On October 28, 1997, DFCS filed a petition to terminate appellants' parental rights.
On November 20, 1997, the father's probation was revoked after his arrest on September 4, 1997, for felony possession of cocaine. Six days later he pled guilty to this offense and was sentenced to ten years, to be served on probation. On April 21-22, 1998, the juvenile court conducted a hearing on the termination of appellants' parental rights. Janet Crouse, who worked for the Cobb County Police Department's crimes against children unit at the time, testified regarding the April 1996 incident which involved the children being left alone in a motel room and A.B.'s severe physical abuse.
In addition to the criminal charges stemming from the motel incident, the father has a considerable criminal history. He has served time in jail in New York, Florida and Georgia for crimes ranging from petty larceny to numerous drug offenses. In April 1996, the father pled guilty to felony possession of cocaine. In November 1997, he again pled guilty to cocaine possession. At the time of the hearing, the father was incarcerated, not knowing when he would be released on parole.
*516 Although the father attended parenting classes, the instructor testified that he did not participate, but "just went through the motions." The father testified that he has not paid any child support because DFCS did not notify him of what amount to pay. The co-director of Living Without Violence, upon screening the father, found that he was an inappropriate candidate for the program because he would not admit to any abusive or controlling behaviors.
The mother testified that when she was 13, she began dating a 36-year-old man whom she later married and who fathered T.B. and A.B. The mother acknowledged that this man physically abused her on a regular basis and that he was "in and out of detox." At the age of sixteen, she gave birth to T.B., and two years later, she gave birth to A.B. When A.B. was still an infant, both children were taken into protective custody and placed in foster care in New York. During counseling relating to the children's foster care, the mother was treated for co-dependency issues as well as for her own sexual abuse as a four-year-old.
In 1995, the mother married appellant-father, who she acknowledged used drugs and alcohol before and after they were married. After the father was incarcerated following his arrest for the April 1996 motel incident, she and the children moved in with a "complete stranger" who had an extensive history of violent criminal offenses. Before the children were removed from her custody, this man "harassed" her, and on at least one occasion, he physically abused her. Even though the mother knew that the father had severely beaten A.B., she and the children continued to live with him after he was released from jail and until his arrest for cocaine possession in September 1997. Although the mother claims they have been separated since his arrest, the father has remained incarcerated, and she presently lives in his trailer and has not filed for divorce. Appellants also share a newborn daughter, who was not part of the termination proceeding.
The mother also testified extensively about her sporadic employment history. At the time DFCS first obtained custody of the children, the mother had worked at McDonald's for two days. She then worked at Piccadilly Cafeteria for eight months and later for a cleaning service. At the time of the hearing, the mother worked as a caretaker for the elderly.
Several witnesses testified regarding the mother's poor parenting skills. The parenting class instructor testified that the mother had difficulty grasping the fact that she was her children's mother, not their playmate, and that she was responsible for protecting them. A foster care worker observed the mother during her visits with the children and testified that A.B. would "act out" during the visits. Although the mother would threaten the children with "time out" and taking things away from them for misbehaving, she never followed through. During one visit, T.B. kicked his mother, and C.J.V. was given little attention at all. The foster care worker testified that the children's problems at these visits were some of the most severe she had ever seen.
The foster care worker assigned to the children's case testified that although the parents obtained psychological assessments, they did not pay for them as required by their court-ordered reunification plan; thus the reports could not be released. The mother's drug and alcohol assessment revealed that although she was not addicted to drugs, she should attend a co-dependency class.
With regard to the children, two psychologists testified regarding A.B.'s considerable emotional, cognitive and behavioral problems. One psychologist described A.B. as one of the most traumatized children she had seen in twelve years. The other psychologist who presently treats A.B. testified that A.B. is cognitively delayed and emotionally fragile, traits frequently seen in abused children. She testified that on two occasions while she was in foster care, A.B. had acted out sexually, including one incident where she put a pencil in a two-year-old's rectum. After A.B. had been taken into protective custody and started receiving psychological treatment, she began to show signs of improvement. However, when the mother still had visitation privileges, A.B. would regress considerably *517 following these visits. Since the suspension of the visits, A.B.'s behavior has improved considerably.
A.B.'s special needs kindergarten teacher testified that during the 1996-1997 school year, A.B. was emotional, fearful and destructive to her surroundings and to herself. A.B.'s "outbursts" at school were more pronounced around her mother's visits, and her regressive behavior would last for several days following these visits.
Although T.B. was not receiving psychological counseling at the time of the hearing, he had received psychological evaluations and treatment in the past. The psychologist who initially evaluated T.B. testified that he was preoccupied with violence between adult figures and that he was afraid his stepfather was going to hurt or kill A.B. The psychologist who had previously treated T.B. testified that he "takes care of [A.B.] and that he could possibly regress if she started doing better or when he reaches adolescence."
At the hearing's conclusion, the children's court-appointed special advocate and their guardian ad litem recommended that appellants' respective parental rights be terminated. The juvenile court entered an order terminating the father's parental rights to C.J.V. and the mother's rights to C.J.V., A.B., and T.B.
In their separate appeals, appellants essentially contend that the juvenile court's order is not supported by clear and convincing evidence that their parental rights should have been terminated under OCGA § 15-11-81(b). The father asserts there was only evidence of abuse "of a child that is not his," and that no evidence was presented to show that C.J.V. was likely to suffer serious harm if his parental rights were not terminated. The mother asserts that the father caused her children's deprivation, and that such deprivation was not likely to continue since he was incarcerated. Both appellants' assertions lack merit.
First, there is no issue as to whether appellants' respective children were deprived. OCGA § 15-11-81(b)(4)(A)(i). A child is deprived if he "[i]s without proper parental care or control ... or other care or control necessary for his physical, mental, or emotional health or morals." OCGA § 15-11-2(8)(A). The juvenile court adjudicated the children deprived in a May 29, 1996 order. "As [appellants] did not appeal the original order of the juvenile court finding that [their] children were deprived, [they] cannot now complain about that finding." (Punctuation omitted.) In the Interest of N.J.W., 233 Ga.App. 130, 133(1)(a), 503 S.E.2d 366 (1998); see also In the Interest of C.L.R., supra at 136-137(1)(a), 501 S.E.2d 296.
Secondly, the evidence is clear and convincing that appellants' "lack of proper parental care and control" was the cause of the children's deprivation. OCGA § 15-11-81(b)(4)(A)(ii). The father's assertion that he did not cause C.J.V.'s deprivation because he abused A.B. is without merit. Clearly, "[e]gregious conduct or evidence of past egregious conduct of the parent toward the child or toward another child of a physically, emotionally, or sexually cruel or abusive nature" is grounds upon which a juvenile court can determine that a child is without proper parental care and control. (Emphasis supplied.) OCGA § 15-11-81(b)(4)(B)(iv). Additionally, clear and convincing evidence of an "[i]njury ... of a sibling under circumstances which constitute substantial evidence that such injury ... resulted from parental neglect or abuse" is also a basis upon which a court can conclude a parent caused his child's deprivation. OCGA § 15-11-81(b)(4)(B)(vi); see also In the Interest of F.G., 233 Ga.App. 153, 503 S.E.2d 387 (1998) (appellant's severe abuse of his partner's child a factor in the termination of his rights to his biological children).
Moreover, the cause of C.J.V.'s deprivation at the hands of his father does not end with a discussion of A.B.'s abuse. "Among the factors to be considered in determining whether [a] child is without `proper parental care or control' is the parent's `excessive use of or history of chronic unrehabilitated abuse of intoxicating liquors or narcotic or dangerous drugs' that has rendered the parent incapable of adequately providing for the child. OCGA § 15-11-81(b)(4)(B)(ii)." In the Interest of C.L.R., supra at 137(1)(a), 501 *518 S.E.2d 296. Additionally, "[c]onviction of the parent of a felony and imprisonment therefor which has a demonstrable negative effect on the quality of the parent-child relationship" also grounds for finding that a child is without proper parental care and control. OCGA § 15-11-81(b)(4)(B)(iii); see also In the Interest of D.T., 221 Ga.App. 328, 329(1), 471 S.E.2d 281 (1996) (repeated inability to overcome drug addiction, with its consequent incarceration and loss of employment, supports finding that termination of parental rights was in best interests of the child). "A conviction of a crime and incarceration [do] not always compel a termination of parental rights but will support such a ruling when adequate aggravating circumstances are shown to exist." (Punctuation omitted.) In the Interest of N.J.W., supra at 133, 503 S.E.2d 366. Clearly, the evidence shows that the father was a habitual drug abuser with numerous incarcerations and felony convictions. Moreover, the father's past convictions include felonious conduct toward a child. See In the Interest of F.G., supra; In the Interest of S.B.H., 216 Ga.App. 861, 456 S.E.2d 620 (1995). Accordingly, there was ample clear and convincing evidence to support the court's finding that C.J.V.'s deprivation was caused, in part, by his father. See In the Interest of D.T., supra at 329, 471 S.E.2d 281.
The mother's argument that the children's deprivation was caused by the father is equally without merit. The evidence is clear and convincing that the children's deprivation was caused, in part, by the mother's fundamental lack of parenting skills. Although the father was primarily responsible for the brutal abuse of his stepdaughter in her siblings' presence, the mother's passivity in response to this tragedy renders her culpable as well. See In the Interest of D.C.N.K., 232 Ga.App. 85, 89, 501 S.E.2d 268 (1998) ("the essence of the evidence shows a form of passive neglect or indifference"). Moreover, instead of shielding her children from the father, she moved back in with him when he was released from jail, even after he pled guilty to cruelty to children and reckless conduct. We also note that while her husband was incarcerated, the mother decided to take her young children and move in with an abusive stranger.
Unfortunately, there is even more evidence to support the court's finding that the mother is a significant cause of her children's deprivation. From their earliest days, the children have spent most of the their time in foster care. When they were not in foster care, they were subjected to a nomadic lifestyle, which included living with their mother's choice of abusive companions. Moreover, as the parenting class instructor testified, the mother was unable to grasp that she was supposed to protect her children. It was also apparent from her visits with her children that she either could not or would not assume the role of parent, but rather conducted herself as her children's playmate. In the case of the baby, C.J.V., the mother was so busy trying to control A.B. and T.B. that she virtually ignored him. The mother's visits with A.B. had a detrimental effect on any improvement A.B. was making while out of her mother's control. In view of the mother's failure to protect her children and her overall lack of parenting skills, we agree with the trial court's conclusion that there was clear and convincing evidence that the children's deprivation originated in significant part from the mother.
Having found that C.J.V., A.B., and T.B. are deprived and that such deprivation is caused by their respective parents, the next factor to be considered is whether their deprivation would likely continue in appellants' care. OCGA § 15-11-81(b)(4)(A)(iii). The father does not appeal that portion of the juvenile court's order holding that C.J.V.'s deprivation would likely continue in his care. The mother, on the other hand, asserts that with the father in jail and out of her life, she will be a better parent. Thus, we address this factor only as it relates to the mother.
"In addition to evidence of present parental misconduct or inability, evidence of past conduct may be considered in determining whether the deprivation would be likely to continue." (Punctuation omitted.) In the Interest of E.C., 225 Ga.App. 12, 16, 482 S.E.2d 522 (1997). "Such an inference is appropriate, since the juvenile court is not required to reunite [the children] with appellant *519 in order to obtain current evidence of deprivation or neglect." Id.
Here, the evidence strongly supports the juvenile court's finding that the mother is unable to manage the lives of her children. Although the mother is currently working and able to pay for her own living expenses, her past work history is sporadic at best, and there is no indication that she is emotionally or physically able to manage three children, one of whom is in therapy for considerable emotional problems and two of whom will most likely need therapy in the future. Moreover, the mother's considerable history of associating herself with abusive men mitigates against returning the children to her. As the juvenile court explained, "She has a lifelong history of doing that and the Court is obviously concerned that she'll do that again, particularly if she was stressed by having these children back in her home. Accordingly, the evidence supports a finding that the deprivation is likely to continue if the children remain in the mother's care."
A finding that the children would likely be harmed by the continued deprivation is also supported by the record. OCGA § 15-11-81(b)(4)(A)(iv). The mother does not appeal that portion of the court's order holding that her children would likely be harmed by their continued deprivation. Thus, we address only the father's contention that C.J.V. was not likely to suffer serious harm if his parental rights were not terminated.
The court found that the father demonstrated a serious lack of interest in C.J.V. by (1) failing to comply with the court's reunification plans; (2) failing to complete the required court-ordered psychological evaluation; (3) failing to complete the violence program as ordered; and (4) failing to adequately participate in the parenting course. The court also noted the father's extensive criminal background and present incarceration. Under these circumstances, we agree with the trial court's determination that continued deprivation is likely to cause C.J.V. serious physical, mental, emotional or moral harm. OCGA § 15-11-81(b)(4)(A)(iv). Compare In the Interest of K.J., 226 Ga. App. 303, 308(2)(b), 486 S.E.2d 899 (1997) (although father incarcerated for most of child's life, there was evidence father and child had a positive relationship).
Both appellants assert that the trial court's conclusions were not supported by explicit findings. It is true that "an order terminating parental rights must contain explicit findings supporting the conclusions" and that "[a] dry recitation that certain legal requirements have been met is insufficient to satisfy the requirements of the law." (Punctuation omitted.) In the Interest of K.J., supra at 307(2)(b), 486 S.E.2d 899. However, such is not the case here where the trial court's order is amply supported by numerous, explicit findings.
"Once the trial court establishes parental misconduct or inability, the second part of the test for determining whether parental rights should be terminated is whether such termination is in the best interest of the child[ren], after considering the physical, mental, emotional, and moral condition and needs of the child[ren] who [are] the subject of the proceeding, including the need for a secure and stable home. OCGA § 15-11-81(a)." (Citation and punctuation omitted.) In the Interest of M.E.C., 228 Ga.App. 9, 10, 491 S.E.2d 107 (1997). "The same evidence showing parental misconduct or inability may, and here does, establish this requirement." (Punctuation omitted.) In the Interest of C.L.R., supra at 138(2), 501 S.E.2d 296. Accordingly, we conclude that the juvenile court's decision was supported by clear and convincing evidence, and that it was in the best interests of C.J.V., A.B., and T.B. for the court to terminate appellants' parental rights. See In the Interest of N.J.W., supra; In the Interest of D.C.N.K., supra.
Judgment affirmed.
POPE, P.J., and BEASLEY, P.J., concur.
NOTES
[1] On January 12, 1998, the biological father of A.B. and T.B. consented to the termination of his parental rights. Appellant-father is A.B. and T.B.'s stepfather.