538 S.E.2d 112 (2000)
245 Ga. App. 468
In the Interest of J.W.H., a child (Two Cases).
Nos. A00A1190, A00A1332.
Court of Appeals of Georgia.
August 4, 2000.
Certiorari Denied February 2, 2001.
*114 McCamy, Phillips, Tuggle & Fordham, David L. Host, Charles L. Daniel III, Dalton, for appellant.
Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Assistant Attorney General, Waycaster, Johnson, Morris & Dean, Cynthia N. Johnson, Dalton, Karen L. Webb, Jerry W. Moncus, Rocky Face, for appellee.
*113 MILLER, Judge.
The issue on appeal in Case No. A00A1190 is whether the court erred in extending the State's custody of a child where competent evidence showed that the child was deprived, the parents were not meeting their reunification plan goals, and the parents had recently surrendered their parental rights to the foster parents on condition that the foster parents be allowed to adopt the child. We hold the court did not err and affirm.
The issue on appeal in Case No. A00A1332 is whether subsequent evidence sufficed to sustain the later termination of the parents' rights to the child. We hold it did and affirm.
Within weeks of J.W.H.'s birth, the Department of Family & Children Services took him into custody. His parents later consented to a deprivation order on May 18, 1999, that found the infant was failing to thrive, i.e., the infant was not being adequately fed and was in a life-threatening condition. They did not appeal this order. The purposes of the order were to place the deprived child in a nonthreatening environment for his safety and well-being and to allow the parents six months to work intensively with DFACS to achieve reunification.
Three months later in August the court reviewed the child's progress and determined that DFACS's custody should continue. Citing the parents' failure to abide by the goals of the reunification plan, DFACS in September petitioned the court to extend DFACS's custody of the child for an additional year. Following a hearing on November 16, the court extended DFACS's custody by one year, which order the father appeals in Case No. A00A1190. Based on a petition to terminate filed November 10, the court held a hearing in December and terminated the parents' rights to the child, which order the father appeals in Case No. A00A1332.
Meanwhile, six days after the citizens review panel recommended in October termination of parental rights, the child's natural parents surrendered to the foster parents their parental rights to J.W.H. on condition that the foster parents be allowed to adopt J.W.H. The foster parents immediately petitioned to adopt the child, which petition is pending. DFACS subsequently placed the child with a second foster family residing in a different county, where he is thriving.
Case No. A00A1190
1. In his appeal of the custody extension order, the father first enumerates as error that the juvenile court failed to make a finding under OCGA § 15-11-41(o)(3) that the extension was necessary to accomplish the purposes of the deprivation order. This enumeration is without merit.
The purposes of the deprivation order were to place the deprived child in a safe, secure environment for his well-being and to give the natural parents six months in which to work intensively with DFACS to meet certain goals to effect reunification. The court found that if placed back with the parents the child would still be deprived, that the parents could not provide a safe, secure environment, and that the parents had failed to achieve the reunification goals. Construed *115 in favor of the decision, clear and convincing evidence supported the findings.[1]
(a) Not Achieving Reunification Plan Goals. With regard to the six goals of the reunification plan, a rational trier of fact could have found clear and convincing evidence that the father was not meeting those goals. First, the father had not attended any parenting classes as required by the plan, despite being offered those classes free of charge. Second, the father was not current on child support payments required by the plan. Third, the reunification plan required the parents to maintain a stable residence for six months, but during the first three months they had five different residences. Fourth, neither parent had visited J.W.H. for over a month prior to the hearing, even though they had been invited to do so if they cleared up some lice or nit infestation problems in their hair. Fifth, the father did not comply with the plan goal of cooperating with DFACS. Sixth, he did not receive recommended family counseling. This evidence sustains the court's finding that the father was not achieving the six reunification plan goals.
(b) Child Was Deprived and Natural Parents Could Not Provide Safe, Secure Environment. Regarding the purpose of the deprivation order to provide the deprived child with a safe, secure environment for his well-being, the evidence at the hearing also showed that the father had a propensity for violence, having (i) threatened to bring a gun to a parenting class, (ii) threatened the foster parents as well as their daughter, (iii) threatened others associated with the child, and (iv) threatened to simply take J.W.H. and leave. He told the foster parents that he was a member of a violent gang and even wore a blue bandanna into the courtroom reflecting such membership. He had not worked in two years and was incapable of identifying his disability. Just a month before the hearing the father and mother considered separation and divorce. The father conceded that he had not given a full effort to care for J.W.H. and that J.W.H. was thriving in foster care. The first foster mother who had dealt with the natural father as well as the DFACS representatives concluded that J.W.H. should not be returned to his natural parents' custody.
In his appellate brief, the father focuses on his and the mother's surrender of parental rights to the first foster parents as evidence that if the custody order were not extended, custody would then not revert to him but to the foster parents, who all parties agreed had provided good care to J.W.H. He argues that since the extension of the order was unnecessary to provide J.W.H. with a safe, secure environment (the purpose of the custody order), OCGA § 15-11-41(o)(3) disallowed the extension of the custody order.
The father's argument fails for two reasons. First, the juvenile court specifically found that the surrender of rights to the foster parents for adoptive purposes[2] was a collusive attempt to bypass the scheduled hearing on the termination of parental rights. Evidence supported this finding, as the father had continuously complained of the care provided by the foster parents until the citizens review panel recommended termination of parental rights. Six days after this recommendation the father and mother suddenly surrendered their parental rights to the first foster parents. If the court finds "that the proposed adoption was merely a subterfuge to thwart the apprehended court-ordered termination of parental rights, nothing would preclude the court from proceeding with the termination-of-parental-rights hearing...."[3] Similarly, a court may continue considering the extension of the order granting custody to DFACS.
Second, the surrenders were conditional on the first foster parents adopting J.W.H. If the adoption were unsuccessful, the surrenders *116 required that J.W.H. be returned to the natural parents. As the court found that this adoption was unlikely,[4] it could hardly assume that allowing the DFACS custody order to expire would not result in the child eventually being sent back to the natural parents.
Clear and convincing evidence supported the trial court's findings underlying the order to extend.
2. Citing Edgar v. Shave,[5] the father complains that the juvenile court had no authority to make a finding that it would not be in the child's best interest to be adopted by any family in that county, including the first foster parents. But this finding was material to predicting the success of the pending adoption petition, which was the condition on which the surrenders to the foster parents depended. Moreover, the foster parents sought to intervene in the legal proceeding. The juvenile court did not exceed its jurisdiction by discussing the likely success of the foster parents' adoption petition.
3. The third enumeration of error assumes that the extension order approves DFACS's plan to end reunification services. The order does not purport to do so, nor does DFACS argue that it was so intended. Thus, this enumeration is without merit.
4. The fourth enumeration of error contends that clear and convincing evidence does not support various findings of the juvenile court. As a rational trier of fact could have found that clear and convincing evidence supported the key findings referenced in Division 1 above, we need not address each of the other secondary findings contested by the father.
Case No. A00A1332
When the same court a month later held a hearing on DFACS's petition to terminate the parents' rights, much of the evidence was repeated regarding the lack of a stable residence, the threatened divorce, the father's failure to cooperate with DFACS, and the parents' failure to visit the child. Additional evidence showed that since the November 16 hearing (i) the parents had made no progress in meeting the plan goals, (ii) they had made no attempts to verify that they were free of head lice or nits so they could visit the child, (iii) the father still failed to attend parenting classes, and (iv) the parents had paid no child support. The parents were constantly arguing and in conflict, the father did not have the patience to deal with a child and refused to accept responsibility for any wrongdoing or to acknowledge any parenting deficiencies, and the father conceded he could not control his volatile emotions. The father was completely uncooperative with DFACS and not only refused to give DFACS his phone number but threatened to "key" the car of a social worker who came to help. He also warned that DFACS "would get theirs...."
Three professionals, including the father's own witness (a mental health case coordinator he had called), all had serious concerns about the father's capability to care properly for the child. Testimony showed that deprivation due to the father's lack of parenting skills would likely continue or not be remedied.
The father called his mental health case coordinator to the stand to explain why the father was not meeting the plan goals or exhibiting appropriate behavior and to indicate his potential for better compliance in the future. The case coordinator was an experienced mental health professional who since 1997 had regularly treated the father for mental illness on an outpatient basis. He recounted in detail the father's psychological problems, including depression or mood disorder, lack of impulse control, irritability, impatience, and lack of insight. These problems, which made it difficult for the father to parent a young infant, helped explain his inability to comply with the plan goals. The mental problems possibly arose from a schizoaffective disorder, schizophrenia, or an unspecified *117 psychotic disorder. Although the case coordinator was hopeful the father's condition could improve with continued treatment and medication, he admitted that the father periodically chose not to comply with the treatment plan and more than once had refused to take the prescribed medication, resulting in a worsening of his symptoms.
Judicially noticing the prior filings and orders in the case, the court found clear and convincing evidence to terminate the parents' rights under the standards set forth in OCGA § 15-11-81. The father appeals on three grounds: (i) the evidence did not suffice as to some factors, (ii) the court erred in considering his failure to comply with the case plan, as such had not been in existence for a year or longer, and (iii) the court had no authority to conclude that the father had a medically verifiable deficiency that made it likely his lack of parental control would continue. We discern no error and affirm.
5. The first question is whether a rational trier of fact could have found clear and convincing evidence (a) of parental misconduct or inability and (b) that the termination of parental rights was in the best interest of the child.[6] The State may show parental misconduct or inability by evidence that (i) the child is deprived, (ii) the lack of parental care caused the deprivation, (iii) this cause is likely to continue or not be remedied, and (iv) the continued deprivation is likely to cause serious harm to the child.[7]
The father does not contest that the child was deprived[8] or that his lack of proper parental care or control caused the deprivation. Rather, he argues that insufficient evidence showed (i) the cause of the deprivation was likely to continue, (ii) the continued deprivation was likely to cause serious harm to the child, and (iii) he had a medically verifiable deficiency. These arguments are without merit.
(a) Cause of Deprivation Likely to Continue. Regarding the likelihood of the deprivation's cause continuing, the court considered the past conduct of the father (which is relevant in determining whether the conditions of deprivation are likely to continue)[9] and the father's mental deficiencies as described by his own witness. The father's repeated failure (i) to support his child, (ii) to visit the child, (iii) to cooperate with any efforts to assist him in acquiring even minimal parenting skills, and (iv) to take his required medications reflected that little change could be expected in the future. The DFACS caseworker who worked closely with the parents opined that the cause of the deprivation was likely to continue in the future.[10] Moreover, the father's mental health case coordinator concluded that the father's debilitating mental disorder was likely to continue in the future. Clear and convincing evidence supported the juvenile court's finding that the cause of the deprivation was likely to continue.
(b) Continued Deprivation Likely to Harm Child. Combined with the evidence of deprivation, these circumstances also authorized the court to find that the continued deprivation was likely to cause serious physical, mental, emotional, or moral harm to the child.[11] This evidence of parental misconduct or inability combined with evidence that the child was thriving in foster care further supported a finding that termination of parental rights would be in the child's best interest.[12]
(c) Medically Verifiable Deficiency. Citing *118 In the Interest of C.G.,[13] the father next claims that insufficient evidence supported a finding that he had a medically verifiable deficiency that rendered him unable to care for the child. Ironically, the testimony regarding the father's mental illness came from the mental health professional called by the father to establish that this mental illness caused the father's past inability to parent the child but was treatable. This witness, who had 15 years of experience in the mental health field and had long treated the father, recounted the debilitating medical diagnoses without objection, which evidence sufficed to establish the medically verifiable deficiency.[14]
6. Because the case plan was only seven months old, the father enumerates as error the court's considering his failure to comply with that plan. Indeed, In the Interest of A.M.B.[15] noted that "it was inappropriate for the trial court to consider this failure [to comply with the plan] due to the fact that the reunification order had not been in effect for one year...." But as A.M.B. also concluded, the error may not be of such magnitude as to require reversal.[16]
OCGA § 15-11-81(b)(4)(C)(iii) directs that the juvenile court shall consider the failure to comply with a reunification plan if the failure has occurred for a year or longer. "By the clear language of the statute, the trial court is not limited to looking solely at subparagraph (b)(4)(C)'s factors...."[17] Thus, the trial court may consider events occurring after a reunification plan was formulated.[18] Here, the court considered the father's failure to support the child, to visit the child, to gain parenting skills, to take his medication, to cooperate with DFACS, to become less violent, to stabilize his housing situation, and to reduce conflict with his spouse. Although these factors also coincided with goals in the reunification plan, that fact does not diminish their probative negative effect on the father's ability to parent the child. Thus, as in A.M.B.,[19] the court did not err in considering them in its evaluation of the factors listed in OCGA § 15-11-81(b)(4)(A).[20]
7. The father cites as error the juvenile court's finding that he had a medically verifiable deficiency of mental illness that rendered him unable to parent the child. Pointing out that the State included no such allegations in its termination petition nor argued such at trial, the father claims he was denied due process by the court sua sponte making this finding.
The father misapprehends the role of this finding in the trial court's decision. In its detailed order, the court set forth the evidence demonstrating that the child was deprived and that the cause of the deprivation was the parents' misconduct and inability. Only as a part of its next finding that the cause of the deprivation would likely continue did the court find that the father's medically verifiable mental condition rendered him unable to care for the child. Thus, this finding was not the central focus of the court's decision, but arose out of the father putting on the mental health professional in his effort to show that the mental illness rendered him unable to comply with the case goals but was *119 likely to be remedied. To demonstrate the inefficacy of the father's argument that the condition would likely be remedied, the court made the finding that his mental health condition was medically verifiable and, as per his own witness, rendered him unable to properly parent the child. The court discounted the likelihood of a remedy in light of the father's past conduct in refusing to take his medication.
This finding was entirely consistent with the allegations of the termination petition, which set forth the actions of the parents reflecting their demonstrated inability to parent the child.[21] The State alleged no mental deficiency and presented no evidence of such in its case-in-chief. Rather, the evidence came in during the father's case as he sought to explain that his misconduct resulted from a treatable mental condition. The court was authorized in these circumstances to make findings as to the root cause for the father's actions, even if such happened to also involve an unalleged factor contained in OCGA § 15-11-81(b)(4)(B)(i).[22]
Judgments affirmed.
POPE, P.J., and MIKELL, J., concur.
NOTES
[1] See In the Interest of S.S., 232 Ga.App. 287, 289, 501 S.E.2d 618 (1998) (appellate court construes evidence in favor of juvenile court's findings to determine if clear and convincing evidence supports continuation of custody in DFACS); see generally OCGA § 15-11-33(b)(1).
[2] Cf. OCGA § 19-8-4 et seq.
[3] Skipper v. Smith, 239 Ga. 854, 857(2), 238 S.E.2d 917 (1977); accord In the Interest of A.N.M., 238 Ga.App. 21, 25(2)(b), 517 S.E.2d 548 (1999).
[4] For example, there was evidence that the father was able to harass the foster parents because they were located in the same county as the father. Despite suggestions from DFACS, the foster parents did not wish to move out of the county. Moreover, the foster parents had often been unable to handle other children assigned to them.
[5] 205 Ga.App. 337, 338(1), 422 S.E.2d 234 (1992).
[6] OCGA § 15-11-81(a); In the Interest of K.D.S., 237 Ga.App. 865(1), 517 S.E.2d 102 (1999).
[7] OCGA § 15-11-81(b)(4); K.D.S., supra, 237 Ga.App. at 865(1), 517 S.E.2d 102.
[8] Cf. In the Interest of C.J.V., 236 Ga.App. 770, 774, 513 S.E.2d 513 (1999) (an unappealed deprivation determination is binding on appeal).
[9] In the Interest of C.W.D., 232 Ga.App. 200, 204(1), 501 S.E.2d 232 (1998).
[10] See Moss v. Moss, 135 Ga.App. 401, 404(5), 218 S.E.2d 93 (1975) (opinions and recommendations of agency caseworker-investigator experienced in sociology and psychology are entitled to great weight).
[11] K.D.S., supra, 237 Ga.App. at 867(1), 517 S.E.2d 102(d); In the Interest of K.L., 234 Ga. App. 719, 722, 507 S.E.2d 542 (1998).
[12] K.D.S., supra, 237 Ga.App. at 867(2), 517 S.E.2d 102; In the Interest of M.E.C., 228 Ga. App. 9, 14-15(2), 491 S.E.2d 107 (1997).
[13] 235 Ga.App. 23, 24-25, 508 S.E.2d 246 (1998).
[14] See In the Interest of A.M.R., 230 Ga.App. 133, 135(1)(a), 495 S.E.2d 615 (1998); compare C.G., supra, 235 Ga.App. at 25, 508 S.E.2d 246 (no medical or psychological testimony or reports offered on deficiency).
[15] 219 Ga.App. 133, 136, 464 S.E.2d 253 (1995).
[16] Id.
[17] (Emphasis supplied.) Id.
[18] Id.
[19] Supra, 219 Ga.App. at 136-137.
[20] Citing In the Interest of S.J.C., 234 Ga.App. 491, 494(2), 507 S.E.2d 226 (1998), and In the Interest of C.W.S., 231 Ga.App. 444, 447-448(3), 498 S.E.2d 813 (1998), the State argues that the one-year requirement of OCGA § 15-11-81(b)(4)(C) has been eliminated. These cases stand only for the proposition that there is no statutory requirement under OCGA § 15-11-41(b) that DFACS make reasonable efforts to reunite the family for at least a year (after a reunification plan is formulated) before seeking to terminate parental rights. The issue in S.J.C. and C.W.S. thus concerned when the State can file to terminate parental rights, not what factors the court can consider in terminating those rights.
[21] See OCGA §§ 15-11-25; 15-11-82(c); Watkins v. Watkins, 266 Ga. 269, 270-271(1), 466 S.E.2d 860 (1996) (State required to set forth in ordinary and concise language the facts demonstrating the deprivation); see generally In the Interest of D.R.C., 191 Ga.App. 278(1), 381 S.E.2d 426 (1989).
[22] We need not consider the State's argument that under OCGA § 9-11-15(b) of the Civil Practice Act unobjected-to evidence retroactively amends the pleadings. Setting aside the fact that this evidence pertained to an existing allegation of the petition (i.e., whether the misconduct or inability would likely be remedied), we note that generally the Civil Practice Act does not apply to juvenile courts. Coleman v. Coleman, 238 Ga. 183, 232 S.E.2d 57 (1977); see English v. Milby, 233 Ga. 7, 9(1), 209 S.E.2d 603 (1974).