587 S.E.2d 282 (2003)
263 Ga. App. 132
In the Interest of M.E.S. et al., children.
No. A03A1487.
Court of Appeals of Georgia.
September 10, 2003.
*283 Akin & Tate, Laura J. Ray, Cartersville, for appellants.
Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Asst. Atty. Gen., Neel & Smith, Barry S. Haney, Cartersville, for appellee.
MILLER, Judge.
The parents of M.E.S., C.A.S., B.N.S., and C.M.S. appeal the termination of their parental rights as to those children. They contend that the State did not sustain its evidentiary burden of proving their present misconduct and inability and of proving that termination of their rights was in the best interests of the children. They also assert that they were denied their constitutional right to due process. We discern no error and affirm.
In reviewing a decision terminating parental rights, we view the evidence in the light most favorable to the factfinder's judgment *284 to decide whether any rational trier of fact could have found clear and convincing evidence that the natural parent's rights to custody have been lost. In the Interest of N.J.W., 233 Ga.App. 130, 503 S.E.2d 366 (1998). We neither weigh the evidence nor determine the credibility of witnesses but defer to the juvenile court's factfinding if supported by evidence. See id.
So viewed, the evidence showed that the Cherokee County Department of Family and Children Services (DFACS) first became involved with the family in October 2000. The family moved to Fannin County, and in December 2000, the Fannin County DFACS removed the children from the appellants' custody after a caseworker went to their home and discovered various injuries to the children and deplorable living conditions.
On February 21, 2001, the Juvenile Court of Fannin County adjudicated all four children deprived and entered a written deprivation order to which the parents consented. In that order, the parents conceded that their children were deprived due to lack of proper parenting and that the children had not been "properly fed, bathed, supervised, disciplined, or nurtured by the parents." The consent order noted, "In addition, the family's home has been unsafe, unsanitary and inadequate for the children. Within the last several months, the family has resided in a tent." The deprivation order obligated the parents to comply with a reunification plan, which required them to: learn and exhibit appropriate parenting skills; attend mental health and domestic violence counseling; demonstrate an ability to budget their finances and ability to support the children; and show that they could provide for the children's medical needs. At that time, M.E.S. was four, C.A.S. was three, B.N.S. was almost two, and C.M.S. was almost one.
The parents moved to Bartow County, and the deprivation case was transferred there. On August 30, 2001, the Juvenile Court of Bartow County entered an order that incorporated the DFAC's reunification plan that required the parents to: learn age appropriate parenting skills; maintain stable employment; maintain stable, appropriate, and sanitary housing; learn budgeting and home management skills; continue counseling until released therefrom; maintain contact with the children through regular visitation; and pay $10 per week per child for reimbursement to the DFACS for child care.
In January 2002, DFACS allowed the appellants to have unsupervised visits with the children, and in February, they were allowed to have physical custody of C.A.S. While C.A.S. was in their custody, the appellants were evicted from their home, they failed to notify DFACS about that eviction, and they went to live with a relative and later to a motel. During that period, C.A.S. amassed 15 unexcused absences from school and he missed several psychological counseling sessions. In April, DFACS removed C.A.S.
On June 14, 2002, DFACS filed a petition to terminate the parents' rights. Over a three-day period in August and September, the juvenile court heard testimony from several witnesses, including the parents. Although the parents steadfastly maintained that they had complied with the goals in the reunification plan, testimony showed otherwise. According to the evidence, the parents failed to learn age appropriate parenting skills. A parent education supervisor testified that despite her efforts to teach parenting skills to the parents, neither was prepared to properly parent a special needs child. She further testified that at the time services were discontinued, the parents still needed "at least six months to a year after care or on-going services."
Neither parent was able to maintain stable employment. Although the parents claimed that the mother had worked primarily at Waffle House for three years, the mother's supervisor testified that the mother was fired from that job in early 2002 due to her frequent absences, excuses, and arrests. Other evidence refuted the mother's claim that she was employed as bookkeeper for her husband's sprinkler installation business. On the final day of the hearing, the mother admitted that she was, in fact, unemployed.
The father fared only slightly better. Between July 30, 2001, and August 12, 2002, the father held five different jobs. Two of his former employers testified that they fired *285 him because he was a slow worker, took a lot of breaks, and did not do quality work. As to his sprinkler business, the father admitted that he had done work for only one customer. Neither parent was able to provide pay stubs or other documentation to DFACS to prove gainful employment.
Other evidence documented the appellants' continuing failure to maintain stable, appropriate, and sanitary housing. Between April and August 2002, they were evicted by court order from two residences, and another dispossessory proceeding was pending as the termination proceedings began. It is undisputed that all three evictions were attributable to the nonpayment of rent. Two landlords described how the parents had left the premises so filthy and damaged that thousands of dollars in repairs and cleaning expenses were incurred. Nor had the parents paid two outstanding eviction judgments. In addition, appellants admitted that when one of their prior residences lacked a working toilet, they had used a bucket for two weeks.
Other evidence indicated that the appellants failed to meet the budgeting and home management skills requirement. A DFACS family educator testified that the parents failed to appear or cancelled appointments with her. She testified that some of the utilities were disconnected for nonpayment. When the assigned caseworkers requested receipts for expenditures, the parents on several occasions offered only excuses, including that "the dog got the receipts."
As to the mental health counseling requirement of the reunification plan, testimony revealed that DFACS had expended approximately $4,000 to assist appellants in meeting this goal. However, the mother missed 21 sessions with her counselor and needed further psychological counseling. The mother's doctor testified that the mother had not been truthful in some of their sessions and that issues about housing and finances had not significantly changed since the inception of counseling more than a year earlier. The doctor further testified that, in her opinion, it would be "very difficult" for the mother to cope with special needs children, and that the mother was not yet capable of providing the stable, structured environment special needs children require. The doctor also testified that the mother had a "well entrenched" pattern of instability that "could potentially be harmful to the children."
Nor did the father attain this goal. The father attended ten counseling sessions, and the counselor testified that although the father had shown some improvement, he continued to be "very inconsistent and immature" partly due to limited intellectual abilities and poor educational background. In the counselor's opinion, although the father would not intentionally harm the children, he might unwittingly allow his children to suffer harm by failing to make choices in the children's best interests and by failing to provide consistency for them. The counselor further testified that the father was not prepared to care for children with special needs.
The appellants did visit the children, but during such visits, the father made inappropriate comments to the children. M.E.S.'s foster mother and C.A.S.'s teacher both testified that the children's behavioral and psychological problems were "always worse" after visitation. A DFACS caseworker and a family educator testified that while the two older children seemed "somewhat bonded" with the appellants, the two younger ones, B.N.S. and C.M.S., did not, and all four children had bonded to some extent with their respective foster parents. They testified that B.N.S. and C.M.S. were both thriving in their potential adoptive homes and would be harmed if removed.
Other evidence showed that the appellants failed to pay the court-ordered child support as required by the plan. The parents had paid just $99 in child support to Fannin County and $69 to Bartow County and had accumulated an arrearage in excess of $2,000.
Other testimony established that the three oldest children have special needs and psychological problems. M.E.S.'s treating psychologist testified that this six-year-old boy told her that while living with his parents, he had been sexually abused by older cousins, and when he told his father about it, he "got in trouble." The doctor testified that M.E.S. *286 "demonstrated very, very aggressive behaviors at school and in the foster home," and that his "behaviors [were] consistent with sexual abuse." The doctor also testified that M.E.S. had acted out sexually toward his younger siblings and other children. She explained that this behavior had been very disruptive to his placements. The doctor further testified that M.E.S. could not currently be placed with any of his siblings, his problems were escalating, and he required "a minimum of one year" in residential treatment. In her professional opinion, M.E.S.'s psychological problems would "get even worse" unless he was placed in a permanent, stable, and structured environment. His foster mother testified that M.E.S. exhibited inappropriate sexual behavior in her home with other children and was "very defiant" and destructive. She testified that after M.E.S. engaged in improper sexual contact with her daughter, she had requested his removal from her home.
C.A.S.'s treating psychologist described C.A.S.'s diagnosis as "a psychosis, not otherwise specified." The doctor reported that the youngster, who disclosed that he was sexually abused by M.E.S., was very aggressive physically and verbally, as well as very moody, oppositional, and defiant. During therapy sessions, C.A.S. revealed that the devil speaks to him and he has another self, who is magical and untouchable. The doctor further testified that C.A.S.'s thinking "seems to be getting more and more disordered." She recommended that C.A.S. be placed in a therapeutic foster home and not be returned to the custody of his parents because he is unstable, might hurt his siblings, and could be at risk if he and M.E.S. resided in the same house.
C.A.S.'s psychologist also testified that in July 2002, she began treating three-year-old B.N.S., who has an eating disorder and for a period of time refused to use the bathroom in her foster home. The doctor characterized these behaviors as very unusual for a child so young, and she described the prognosis for B.N.S. as "mixed." In her opinion, both C.A.S. and B.N.S. required permanency and exceptional parenting and, therefore, would be harmed by continued exposure to their parents' instability.
The placement supervisor at Bartow County DFACS testified that due to the special needs of M.E.S. and C.A.S., DFACS was seeking therapeutic or institutional placement for them. She also testified that the two younger children, B.N.S. and C.M.S., were "very much bonded" to their foster parents and their removal from those homes "would be extremely detrimental." She added that the two older children had already begun to experience foster care drift, which was definitely harmful to them.
The children's guardian ad litem testified that the two younger children are "thriving where they are" and "are in great homes." Based on his firsthand knowledge and interviews, he recommended that the parents' rights be terminated as to all four children. The juvenile court entered an order doing so.
1. The appellants contend that they were denied due process because the petition to terminate their parental rights did not mention any allegations of sexual misconduct. They assert that they did not receive proper notice that evidence of sexual abuse would be introduced during the proceeding.
Before trial the appellants moved in limine to exclude testimony and evidence "regarding psychosexual evaluations and sexual allegations of abuse, molestation, and/or abuse, sexual abuse by the children against other children." They claimed that the termination petition failed to allege any "sexual misconduct or failure to protect," and that the State failed "to properly notify [them] by an amended pleading and notice." The State argued that the petition placed the parents on notice that "lack of proper parental care and control" would be in issue. The State pointed out that the parents had been provided copies of the evaluations and that the case plan had addressed the issue of counseling. The children's guardian commented that because there had been "substantial counseling going on along these lines," it would be difficult to explain how the parents did not know about the allegations of sexual abuse or the incidents of sexual acting out by the children. In denying the motion, the court noted that the parents had received two months notice *287 based on the subpoenas. The court offered the parents additional time to interview witnesses and the opportunity to bring witnesses back for further cross-examination.
A careful reading of the termination order shows that the juvenile court based its findings of parental inability on the parents' abject failure to comply with the requirements of the case plan, especially their continuing failure to obtain stable employment and to maintain suitable housing. Neither parent was accused of sexually abusing any of the children. Rather, evidence of past sexual abuse was relevant and admissible to establish the complex psychological problems of the two older children, to demonstrate the special needs of those two children, and to expose the danger that reunification would pose.
Some of the children's psychological problems were attributable to their victimization. So, introduction of evidence about that issue could hardly have been a surprise to either parent. Two of the State's expert witnesses explained that three of the children have special needs. Two additional experts testified that neither parent was capable of caring for children with special needs. Since evidence of past sexual abuse was relevant and presented for a proper purpose, the juvenile court did not err in admitting and considering such evidence in reaching its decision. Cf. In the Interest of J.W.H., 245 Ga.App. 468, 474-475(7), 538 S.E.2d 112 (2000).
2. The appellants contend that the juvenile court erred in terminating their parental rights because the State failed to present clear and convincing evidence of parental misconduct or inability. We disagree.
Parental misconduct or inability is demonstrated by showing that the criteria listed in OCGA § 15-11-94(b)(4)(A) have been met. These criteria are: (i) that the child is deprived; (ii) that lack of proper parental care or control is the cause of the child's deprivation; (iii) that the cause of the child's deprivation is likely to continue or unlikely to be remedied; and (iv) that the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. Id. These same factors may also support a finding that terminating the parent's rights is in the child's best interest. In the Interest of C.N.H., 238 Ga.App. 50, 53-54(2), 517 S.E.2d 589 (1999).
Here, because the parents did not appeal the deprivation order, it is undisputed that the children were, in fact, deprived. See In the Interest of R.G., 249 Ga.App. 91, 93(1)(a), 547 S.E.2d 729 (2001). Moreover, the record plainly establishes that the appellants did not accomplish the goals of the reunification plan. They failed to maintain stable employment and to maintain stable, appropriate, and sanitary housing. Neither parent was able to successfully complete the required psychological counseling that would enable them to parent children with special needs. Nor were they able to learn and apply budgeting and home management skills. Nor did they make regular child support payments.
Other evidence showed that lack of proper parental care caused the children's deprivation. On one occasion, prior to state placement, when a caseworker went to their home, a four-year-old answered the door with broken glass in his mouth. While in the custody of their parents, M.E.S. was sexually abused by relatives and C.A.S. was sexually abused by M.E.S.
The record supports findings that the cause of the children's deprivation is unlikely to be remedied and that the continued deprivation is likely to cause physical, mental, emotional, or moral harm to the children. See OCGA § 15-11-94(b)(4)(A)(iii), (iv).
3. The appellants contend that the juvenile court erred in terminating their parental rights because the State failed to prove by clear and convincing evidence that termination of their parental rights was in the best interests of these children.
As outlined above, the evidence clearly established parental misconduct or inability within the meaning of OCGA § 15-11-94(b)(4)(A)(i) through (iv). In determining whether the deprivation is likely to continue, the juvenile court may consider the past conduct of the parent. In the Interest of D.S., 247 Ga.App. 569, 573, 545 S.E.2d 1 *288 (2001). Here, both parents displayed a pattern of parental inability shown by their drifting from job to job after discharge and from home to home after eviction. One of the State's experts testified without contradiction that permanency and a stable environment are extremely important to the children's well-being. Yet, despite the intervention by DFACS, the well-entrenched patterns of instability in employment and housing continued unabated. The evidence shows that the "continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child[ren]." OCGA § 15-11-94(b)(4)(A)(iv). Considering the needs of the children for a stable home, the detrimental effects of prolonged foster care, and the evidence of the parents' inability to provide for the children's basic physical, mental, and emotional needs, we find that the record contains evidence to support the juvenile court's finding that termination of parental rights was in the best interests of these children. See In the Interest of B.L.S., 239 Ga.App. 771, 775-776, 521 S.E.2d 906 (1999).
Judgment affirmed.
SMITH, C.J., and RUFFIN, P.J., concur.